# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THERESA ROBERSON, as Personal | : |
| Representative of the estate of ALAN | : |
| MARTIN | : |
| | : **1:07 CV 00977** |
| v. | : **JR** |
| | : |
| THE DISTRICT OF COLUMBIA, *et al.* | : |

### PLAINTIFF THERESA ROBERSON'S RULE 26(A)(2) STATEMENT

Plaintiff Theresa Roberson, by and through counsel hereby submits her Rule 26(a)(2)

Statement. Plaintiff reserves the right to supplement and/or amend her list of expert witnesses and

the expert's opinions pending completion of additional discovery, including but not limited to, the

30(b)(6) Deposition of the District of Columbia, which initially was scheduled for May 6, 2008 but

was rescheduled on multiple occasions at the request of the Defendants, the receipt of additional

documents sought from the District of Columbia, and the receipt of Defendants' Rule 26(a)(2)

Statement. Plaintiff may also supplement this Statement with additional support for its experts'

opinions. Plaintiff also expressly reserves the right to designate rebuttal testimony depending upon

the testimony of Defendants' experts.

**Retained Experts**

1. James Cornish, M.D.
   Center for Studies of Addiction
   University of Pennsylvania
   3535 Market Street, 4th Floor
   Philadelphia, PA 19104-3309

Dr. Cornish is a psychiatrist with extensive experience diagnosing and treating patients with
bipolar disorder and substance abuse problems, such alcohol abuse. Dr. Cornish will testify
regarding Alan Martin's medical and psychiatric conditions before his admission to St. Elizabeths,
during his admission, and his condition after he was assaulted up and to his death. Dr. Cornish will
testify regarding Dr. Martin's pain and suffering and his ability to comprehend his physical state and
pain after the assault. Dr. Cornish will also testify to Dr. Martin's life expectancy.

LAW OFFICES
KOONZ, MCKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006

(202) 659-5500

Dr. Cornish will testify consistent with his report and with his deposition in the event it is taken by the Defendants. Dr. Cornish's report and curriculum vitae are attached. Plaintiff will supplement this Statement with a signed report once the signature page is received from Dr. Cornish. Also attached is an article which Dr. Cornish may rely on. Dr. Cornish has not given deposition testimony or trial testimony within the last four years. Dr. Cornish's fees are $350 per hour and $3000 for court testimony (full day).

        2.      Ken Duckworth, M.D.
                 Medical Director
                 Vinfen Corporation
                 950 Cambridge Street
                 Cambridge, MA 02141

Dr. Duckworth is a psychiatrist with knowledge of the national standard of care as it relates to facilities such as St. Elizabeths Hospital. Dr. Duckworth will testify to the numerous breaches in the standard of care committed by the Defendants. He will also testify that St. Elizabeths failed to exercise professional judgment with respect to its treatment of mentally ill patients, such as Alan Martin and William Dunbar, and that St. Elizabeths grossly departed from generally recognized standards for psychiatric facilities.

Dr. Duckworth will testify consistent with his report and with his deposition in the event it is taken by the Defendants. Dr. Duckworth's report and curriculum vitae are attached. In the past four years, Dr. Duckworth has only testified in the following case: Disability Advocacy, Inc. v. Pataki, United States District Court for the Eastern District of New York. Dr. Duckworth's fee is $300 per hour.

**Medical Experts**

        1.      Treating Healthcare Providers from Howard University and Heartland Nursing Home

Plaintiff reserves the right to call any and all of the Decedent's health care providers to testify concerning any and all aspects of the medical treatment rendered to the Decedent. These experts may provide fact and/or expert testimony concerning any aspect of the care and treatment rendered to the Decedent, including the nature and extent of the injuries sustained by the Decedent, any diagnosis made with respect to the Decedent, any medical treatment and/or diagnostic tests performed on the Decedent, any medical expenses incurred as a result of the treatment of the Decedent, any pain and suffering suffered by Decedent and any other material related to the care and treatment of the Decedent. In addition, treating healthcare providers may also testify to Decedent's future medical needs and the costs thereof. They may also discuss the cause of Decedent's injuries, prognosis, appropriate treatment options, and the extent of permanent injury. The contents of all medical records are adopted by reference.

        2.      D.C. Medical Examiner or her Designee to testify consistent with the autopsy report and to testify that Decedent died from injuries sustained during the assault at St. Elizabeths and that his death was ruled a homicide.

LAW OFFICES
KOONZ, MCKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006
(202) 659-5500

Respectfully submitted,

KOONZ, MCKENNEY, JOHNSON,
  DEPAOLIS & LIGHTFOOT

_____

### CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 3rd day of July 2008 a copy of the foregoing Plaintiff Theresa Roberson's Rule 26(a)(2) Statement was sent via electronic filing to:

Alex Karpinski, Esquire
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001

_____
William P. Lightfoot

KMJDL No. 40514

LAW OFFICES
KOONZ, MCKENNEY,
JOHNSON, DEPAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006

(202) 659-5500

## Index of Attachments

1. Dr. Cornish Curriculum Vitae
2. Dr. Cornish Report
3. Article which Dr. Cornish may rely on
4. Dr. Duckworth Curriculum Vitae
5. Dr. Duckworth Report

LAW OFFICES
KOONZ, McKENNEY,
JOHNSON, DePAOLIS
& LIGHTFOOT
JAMES MONROE BUILDING
2001 PENNSYLVANIA AVE., N.W.
SUITE 450
WASHINGTON, D.C. 20006

(202) 659-5500

# UNIVERSITY OF PENNSYLVANIA — SCHOOL OF MEDICINE

## Curriculum Vitae

**April 2008**

### James W. Cornish, M.D.

| | |
|---|---|
| **Home Address:** | 2947 Columbia Drive<br>Bensalem, PA 19020-2109 |
| **Office Address:** | Center for Studies of Addiction<br>University of Pennsylvania<br>3535 Market Street, 4th Floor<br>Philadelphia, PA 19104-3309<br>215-746-7274<br>&<br>Department of Veterans Affairs Medical Center — Philadelphia<br>Psychiatry Service<br>3900 Woodland Avenue<br>Philadelphia, PA 19104-4594<br>215-823-5809 |

**Internet Address:**   cornish_j@mail.trc.upenn.edu

**Penn ID Number:**   10024108

**Education:**

| | | |
|---|---|---|
| 9/64-1/66 | | Temple University, Philadelphia, PA |
| 8/67-6/70 | B.S. | Saint Joseph's University, Philadelphia, PA (Biology) |
| 9/70-6/74 | M.D. | Jefferson Medical College, Philadelphia, PA |

**Postgraduate Training and Fellowship Appointments:**

| | |
|---|---|
| 7/74-6/77 | Dual Appointment - Combined Internship - First Year Surgical Residency<br>Second and Third Year Surgical Residency, Bryn Mawr Hospital, Bryn Mawr, PA |
| 7/77-6/80 | Psychiatry Residency, Norristown State Hospital, Norristown, PA |
| 7/80-6/81 | Administrative Psychiatry Fellowship, Norristown State Hospital, Norristown, PA |

**Military Service:**   none

**Faculty Appointments:**

Department of Psychiatry, University of Pennsylvania School of Medicine:

| | |
|---|---|
| 10/85-2/88 | Adjunct Assistant Professor of Psychiatry |
| 3/88-9/92 | Clinical Assistant Professor of Psychiatry |
| 10/92-8/95 | Research Assistant Professor of Psychiatry |

| | |
|---|---|
| 9/95-6/01 | Assistant Professor of Psychiatry |
| 7/01- | Associate Professor of Psychiatry |

Departement de Psychiatrie, Université de Bordeaux II,  Bordeaux, France

| | |
|---|---|
| 9/94-8/95 | Professor Associé de Psychiatrie (Visiting Associate Professor) |

**Hospital and Administrative Appointments:**

| | |
|---|---|
| 8/77-6/79 | Emergency Staff Physician, Crozer-Chester Medical Center, Chester, PA |
| 7/79-6/80 | Resident Member of Training Committee, Norristown State Hospital |
| 8/79-6/80 | Staff Physician, Eagleville Hospital & Rehabilitation Center, Eagleville, PA |
| 7/80-6/82 | Member of Residency Training Committee, Norristown State Hospital |
| 9/82-9/87 | Special Consultant, Psychopharmacology, Norristown State Hospital |
| 3/88- | Staff Psychiatrist, Veterans Affairs Medical Center (VAMC), Philadelphia |
| 9/89- | Medical Staff, Hospital of the University of Pennsylvania (HUP) |
| 5/02-6/03 | Medical Staff, Presbyterian Medical Center, HUP |
| 10/90- | Director of Pharmacotherapy Division, Treatment Research Center, University of Pennsylvania and Philadelphia VAMC |

**Specialty Certification:**

| | |
|---|---|
| 1981 | American Board of Psychiatry and Neurology, Certified Diplomate in Psychiatry,  certificate number 22767 |

**Licensure:**     Pennsylvania

**Awards and Honors:**

| | |
|---|---|
| 1964 | Valedictorian, West Philadelphia High School |
| 1970 | Experimental pre-medical program, Temple University, Philadelphia |
| 1970-74 | Elected class representative and treasurer for medical school class |
| 1972 | Medical student trainee for Pennsylvania Department of Health |
| 1972 | Student representative, American Association of Medical Colleges Meeting |
| 1972-74 | Recipient of Rosenthal Medical Scholarship |
| 1973-74 | President of Jefferson Chapter of Student National Medical Association |

**Memberships in Professional Organizations:**

National Societies:

| | |
|---|---|
| 1975-01 | American Medical Association (national, state and county) |
| 1979-02 | American Psychiatric Association |
| 1980- | National Medical Association |
| 1981-95 | Black Psychiatrists of America |
| 1982-88 | American College of Neuropsychopharmacology (Corporate Representative) |
| 1986-88 | American Epilepsy Society |
| 1986-01- | American Association for the Advancement of Science |
| 1996- | College on Problems of Drug Dependence Minority Representation Committee 1999-2004 |

2004-        American Society of Addiction Medicine

Local Societies:
1988-05    Medical Society of Southeastern Pennsylvania
1990-02    Philadelphia County Medical Society
2001-       John Morgan Society, University of Pennsylvania
2002-       Physicians' Study Group on Addictions of Delaware Valley (secretary)

National Scientific Committees:
1983-03    Board Examiner — American Board of Psychiatry and Neurology
1993-97    National Institute of Alcohol Abuse and Alcoholism (NIAAA) – member of  the
              Initial Review Group (IRG) for grants. (ALCP-2, Elsie Taylor)
1997-01    NIAAA, ad hoc grant reviewer
1995-00    National Institute on Drug Abuse (NIDA) Medications Development,  Member,
              Protocol Review Committee and (1997) Regulatory Committee.
2002- 04   National Academy of Sciences, Member,
              Committee on Vaccines Against Drugs of Addiction, National Research Council,
2002-       Member, Annenberg Foundation Trust at Sunnylands Commission on Adolescent
                 Substance and Alcohol Abuse (Charles P. O'Brien, chair)
2003-08    NIDA-E Initial Review Group for grants (Kay Nimit)

Local Scientific Committees:
1990-02    Philadelphia County Medical Society, Subcommittee on Alcoholism and
              Other Addictive Disorders
2002-06 ·  Physicians Study Group on Addictions — secretary
2003-       Member, Institutional Review Board, Treatment Research Institute (Philadelphia)

**Editorial Positions:**

1997-       ad hoc Reviewer, Drug and Alcohol Dependence
1998-       Referee, Journal of Studies on Alcohol
1999-       Reviewer, American Journal of Psychiatry
2000-       Reviewer, Journal of the American Medical Association
2000-       Reviewer, Journal of Substance Abuse Treatment
2000-       Reviewer, Addictions (journal)
2000-       Reviewer, Journal of the National Medical Association
2004-08    Member, Editorial Board of Science & Practice Perspectives, NIDA publication

**Academic Committees at the University of Pennsylvania and Affiliated Hospitals:**

1988-07    Member, Admissions Committee, School of Medicine
1988-92    Faculty Student Advisor, School of Medicine
1991-94    Medical Student Preceptor for Summer Internship for West Philadelphia.
              Community Outreach Program
1993-       Medical Student Preceptor for "Bridging the Gaps" Project
1997-00    Medical Student Preceptor for "Pipeline " a Penn neurophysiology program from
              for local high schools
1991-99    Member, Institutional Review Board, Philadelphia VA Medical Center
1997-       Interview/Evaluator, Residency Recruitment Committee, Office of Education,

| | |
|---|---|
| 1999-04 | Philadelphia VAMC, Research and Development Committee, Chairperson |
| 1999-00 | Philadelphia VAMC, member, National Search Committee for Associate Chief of Staff for Research and Development |
| 2001-08 | U of P Office of Human Studies (OHR), Faculty Advisory Committee |
| 2004- | Member, Institutional Review Board #2, Philadelphia VA Medical Center |
| 2007-08 | Philadelphia VAMC, member, National Search Committee for Associate Chief of Staff for Behavioral Health |

**Major Teaching and Clinical Responsibilities at the University of Pennsylvania and Affiliated Hospitals:**

- "Tobacco (nicotine) and Marijuana" lecture for First Year Medical Student class
- Supervision of psychiatric residents in the outpatient clinic
- Supervision and rounds for psychiatric residents rotating at VA Substance Abuse Treatment Unit
- Supervision and teaching for Fellows in Substance Abuse Fellowship and
- Supervisor and Mentor for participants in the Medical Student Fellowship in Substance Abuse in cooperation with the National Medical Fellowships
- Faculty participant in Office of Minority Affairs
- Mentor for programs sponsored by Center of Excellence on Minority Health
- Coordinator and Mentor for NIDA Summer Internship for Underrepresented College and High School students
- Course on Urban and Community Health for Penn students from schools of medicine, nursing, social work, dentistry and law; Presenter for session on "Community Health and Substance Abuse".
- "Substance Related Disorders" for NURS 645 – Psychopharmacology

**Research Grants:**

| | |
|---|---|
| 1990-95 | Recipient of a National Institute on Drug Abuse Scientist Development Award for Clinicians - Grant # 1K20 DA 00144-01 |
| 1990-97 | Principal Investigator of Medication Development Projects for NIDA Addiction Research Center, P50 DA 05186; |
| 1992-97 | Treatment Research Unit, R18 DA 06107; and VA Merit Review Center, C.P. O'Brien, overall P.I. |
| 1997-02 | Principal Investigator of Naltrexone In Probationers Study, component of Research on Treatment and Prevention of IV Drug Abuse, NIDA Center Grant, 2 P60 DA05186-11, C.P. O'Brien, overall P.I. |
| 1999-03 | GABA B Agonists in Human Cocaine Dependence P.I. — A. R. Childress Cornish as Investigator NIH/NIDA  1 R01 DA12162-02A |
| 2000-06 | Principal Investigator of Naltrexone Treatment of Opioid Dependent Parolees |

NIDA Grant #  1RO1DA12268

2002-06    Center for Research on Improving Treatment of Drug Abuse
NIDA Grant # 2P60 DA005186-16
Charles P. O'Brien, M.D., Ph.D. overall P.I.

2007-12    Center for Research on Improving the Treatment of Drug Abuse
NIDA Grant # P5-P60-DA-005186-21
Charles P. O'Brien, M.D., Ph.D. overall P.I.

2006-10    Depot Versus Oral Naltrexone Treatment of Opioid-Dependent Parolee
Dana Foundation (O'Brien)
P.I. — Charles P. O'Brien, M.D., Ph.D.

2008-13    Treatment Study Using Depot Naltrexone  (1 of 6,  Philadelphia)
NIDA Grant #  1R01 DA 02455301
Charles P. O'Brien, M.D., Ph.D. overall P.I. for multiple-site study
James W. Cornish, M.D.  site P.I. for Philadelphia

**Pending Research Grants:**

**Lectures by Invitation:**

Aug. 30, 1999    "Use of Naltrexone in the Treatment of Opiate Addiction",
1999 National HIV Prevention Conference, Atlanta, GA

April 29, 1999    "Naltrexone and the Criminal Justice System", ADAM 3rd Annual Conference
(National Institute of Justice), Chicago, IL

July  15, 1998    "Naltrexone for Probationers", NIDA/National Institute of Justice Meeting,
Bethesda, MD

June   3, 1998    "Targets for Medication to Prevent Relapse", for Symposium 80,
"Medications Development for Substance Dependence",  Annual
Meeting of American Psychiatric Association, Toronto, Ontario

April 29, 1998    "Addiction Medicine", Medical Grand Rounds, Abington, PA

April 17, 1998    "Naltrexone for Probationers", NIDA Symposium at Annual Meeting of the
American Society of Addiction Medicine, New Orleans, LA

Nov. 13, 1997    "Federal Probationers and Naltrexone", NIDA Conference, Rockville, MD

April 30, 1997    "Substance Abuse Research and Treatment", School of Medicine, Morehouse
University, Atlanta, GA

April  17, 1996    "Pharmacotherapy for Addictive Disorders", Howard University, Washington, DC

Sept. 20, 1996    "Psychosocial Treatment in Medication Trials", NIDA Workshop on
Psychotherapy, Bethesda, MD

May  31, 1995    "Le Crack Sur La Côte Est Des États-Unis", at symposium entitled Le Crack: de
l'Amerique à l'Europe; la reduction des risques à l'épreuve, Paris, France

June 27, 2001    "Maximizing Effect: A Successful Collaboration in Philadelphia", 2001
ONDCP (Office of National Drug Policy) Technology Symposium, San Diego, CA

Jan. 29, 2002    American College of Neuropsychopharmacology Lectures:
&    "Substance Abuse Treatment Within the Criminal Justice System,

Feb 27, 2002    Charles Drew University (Jan) & Morehouse School of Medicine (Feb)

Mar. 7, 2003    "Naltrexone in the Treatment of Opiate Dependence" workshop at the meeting

The Opiate Challenge , State College, PA

**Organizing Roles in Scientific Meetings:**

May  1994        Chairperson for Symposium on "Treatments for Cocaine Dependence",
                 Annual Meeting of APA, Philadelphia, PA

Feb 23, 1998     Assisted Dr. O'Brien with organization of meeting and made presentation of
                 results from the naltrexone probationers study to the National Drug Czar,
                 General Barry McCafferey, during his visit the University of Pennsylvania
                 School of Medicine.

**Bibliography:**

Research Publications, peer reviewed:

Cornish JW: Diabetic angiopathies in the lower extremity. *Journal of the Student National Medical Association*, 3(1):3-5, 1974.

Barone JA, Bierman RH, Cornish JW, Hsuan A, Drake ND, Colaizzi JL:  Safety evaluation of ritanserin - an investigation of serotonin antagonist. *Drug Intelligence and Clinical Pharmacology,* 20(10): 770-775, 1986.

Jenkins SW, Warfield NA, Blaine JD, Urschel H, Ling W, Rosen M, Cornish J, Wesson D, Ziedonis D: A pilot trial of gepirone vs. placebo in the treatment of cocaine dependence. *Psychopharmacology Bulletin*, 28: 12-26, 1992.

Alterman AI, Droba M, Antelo RE, Cornish J, Sweeney KK, Parikh GA, O'Brien CP: Amantadine may facilitate detoxification of cocaine addicts. *Drug and Alcohol Dependence,* 31: 19-29, 1992.

Cornish JW, Henson D, Levine S, Volpicelli J, Inturrisi C, Yoburn B, O'Brien CP: Naltrexone maintenance: the effect on morphine sensitivity in normal human volunteers. *The American Journal on Addictions,* 2: 34-38, 1993.

Alterman AI, O'Brien CP, McLellan AT, August DS, Snider EC, Droba M, Cornish JW, Hall CP, Raphaelson AH, Schrade FX:  Effectiveness and costs of inpatient versus day hospital cocaine rehabilitation. *Journal of Mental and Nervous Disorders,*  182: 157-163, 1994.

Cornish JW, Maany I, Fudala PJ, Neal S, PooleSA, Volpicelli P, O'Brien CP: Carbamazepine treatment for cocaine dependence.  *Drug and Alcohol Dependence*, 38: 221-227, 1995.

Margolin A, Kosten TR, Avants SK, Wilkins J, Ling W, Beckson M, Arndt IO, Cornish J, Ascher JA, Li S-H, Bridge P:  A multicenter trial of bupropion for cocaine dependence in methadone-maintained patients. *Drug and Alcohol Dependence*, 40: 125 131, 1995.

Kampman K, Volpicelli JR, Alterman A, Cornish J, Weinrieb R, Epperson L, Sparkman T, O'Brien CP: Amantadine in the early treatment of cocaine dependence: a double-blind, placebo-controlled trial. *Drug and Alcohol Dependence*, 41: 25-33, 1996.

Ehrman RN, Robbins SJ, Cornish JW, Childress AR, O'Brien CP: Failure of ritanserin to block cocaine cue reactivity in humans. *Drug and Alcohol Dependence*, 42: 167-174, 1996.

Ehrman RN, Robbins SJ, Cornish JW: Comparing self-reported cocaine use with repeated urine tests in outpatient cocaine abusers. *Experimental and Clinical Psychopharmacology*, 5 (2): 150-156, 1997

O'Brien CP, Cornish JW, Auriacombe M: Apport de la naltrexone dans le traitment de l'alcoolisme. *Alcoologie*, 19 (3 Suppl): 341-346, 1997.

Cornish JW, Metzger D, Woody GE, Wilson D, McLellan AT, Vandergrift B, O'Brien CP: Naltrexone pharmacotherapy for opioid dependent federal probationers. *Journal of Substance Abuse Treatment*, 14: 167-74, 1997.

Auriacombe M, Cornish JW, Skoble L, O'Brien CP: The naloxone conjunctival test: an underused tool? A review of the available data. *European Psychiatry*, 12:255-258, 1997

Cornish JW, Auriacombe M, Tignol J, O'Brien CP: De la cocaïne au crack. *La Press Médicale,* 27: 312-18, 1998

Cornish JW and O'Brien CP: Developing medications to treat cocaine dependence: a new direction. *Current Opinion in Psychiatry*, 11:249-51, 1998

Cornish JW and O'Brien CP: Pharmacotherapies to prevent relapse: disulfiram, naltrexone and acamprosate. *Medicine,* 27:2:26-28, 1999.

Romach MK, Kampman K, Glue P, Kaplan HL, Somer GR, Clarke L, Coffin V, Cornish J, O'Brien CP, Sellers EM: Attentuation of the euphoric effects of cocaine by the dopamine D1/D5 antagonist ecopipam (SCH 39166). *Archives of General Pscyhiatry*, 56:1101-1106, 1999.

Robbins SJ, Ehrman RN, Childress AR, Cornish JW, O'Brien CP: Mood state and recent cocaine use are not associated with levels of cocaine cue reactivity. *Drug and Alcohol Dependence*, 59(1): 33-42, 2000.

Kampman KM, Volpicelli JR, Alterman AI, Cornish J, Sparkman T, O'Brien CP: Amantadine in the treatment of cocaine dependent patients with severe cocaine withdrawal symptoms. *American Journal of Psychiatry*, 157: 252-254, 2000.

Ehrman RN, Robbins SJ, Cornish JW: Results of a baseline urine test predict levels of cocaine use during treatment. *Drug and Alcohol Dependence*, 62: 1-7, 2001.

Kampman KM, Volpicelli JR, Mulvaney F, Alterman AI, Cornish J, Gariti P, Cnaan A, Poole S, Muller E, Acosta T, Luce D, O'Brien CP: Effectiveness of propranolol for cocaine dependence may depend on cocaine withdrawal symptom severity. *Drug and Alcohol Dependence*, 63: 69-78, 2001.

Cornish JW, Maany I, Fudala PJ, Ehrman RN, Robbins SJ, O'Brien CP: A randomized, double-blind, placebo-controlled study of ritanserin pharmacotherapy for cocaine dependence. *Drug and Alcohol Dependence*, 61: 183-189, 2001.

Cornish JW, Gariti P: Exploring medications to treat nicotine dependence. *Essential Psychopharmacology*, 4(4): 325-338, 2002.

Kampman K, Majewska MD, Tourian K, Dackis C, Cornish J, Poole S, O'Brien CP. A pilot trial of piracetam and ginkgo biloba for the treatment of cocaine dependence. *Addictive Behaviors*, 27: 1-12, 2002.

Cornish JW, Herman BH, Ehrman RN, Robbins SJ, Childress AR, Bead V, Esomonde CA, Martz K, Poole S, Caruso FS, O'Brien CP: A randomized, double-blind, placebo-controlled safety study of high-dose dextromethorphan in methadone-maintained male inpatients. *Drug and Alcohol Dependence*, 67(2):177-183, 2002.

Dackis CA, Lynch KG, Yu E, Samaha FF, Kampman KM, Cornish JW, Rowan A, Poole S, White L, O'Brien CP: Modafinil and cocaine: a double-blind, placebo-controlled drug interaction study. *Drug and Alcohol Dependence*, 70(1): 29-37, 2003.

Sayers SL, E. Campbell EC, Kondrich J, Mann SC, Cornish J, O'Brien C, Caroff SN: Cocaine abuse in schizophrenic patients treated with olanzapine versus haloperidol. *Journal of Nervous and Mental Disease*, 193(10): 673-679, 2005

<u>Contributions to peer-reviewed clinical research publications,  participation cited but not by authorship:</u>

<u>Research Publications, non-peer reviewed:</u>

Kampman KM, Volpicelli JR, Alterman AI, Pettinati H, Muller E, Acosta T, Leiderman D, Bridge P, Gariti P, Cornish J, O'Brien CP: Propranolol for the treatment of cocaine dependence: a double-blind, placebo-controlled  trial. *NIDA Research Monograph*, 179: 57, 1998.

Yu E, Herman BH, Fudala PJ, Montgomery A, Chiang N, Walsh R, Macfadden W, Kampman K, Dhopesh V, Cornish J, Vocci FJ, Bridge P, OBrien CP:  An open-label pilot safety study of lofexidine for the treatment of opiate withdrawal.  NIDA Research Monograph 178: 306, 1998

Kampman KM, Volpicelli JR, Alterman AI, Cornish J, Weinreib RM, Acosta TA, Luce DD, O'Brien CP:  Amantadine and propranolol improve treatment outcome in patients with severe cocaine withdrawal symptoms.  NIDA Research Monograph 180: 115, 2000

Moseri JL, Kampman KM, Cornish J, Childress AR, O'Brien CP:  Clomipramine for the treatment of cocaine dependence.  NIDA Research Monograph 180: 165, 2000

Yu E, Herman BE, Miotto K, Montgomery A, Fudala PJ, Fisher C, Chiang CN, Kampman K, Dhopesh V, Cornish J, Walsh B, Davies K, Vocci F, Ling W, O'Brien CP:  In-patient safety

evaluation of lofexidine, an alpha-2 adrenergic agonist, as a medication for opiate withdrawal.  NIDA Research Monograph 180: 227, 2000

Cornish JW, Maany I, Fudala PJ, Poole SA, O'Brien CP: An analysis of factor influencing subject participation in a trial of carbamazepine for cocaine dependence.  *NIDA Research Monograph*, in press.

Abstracts:

Herman BH, Cornish JW, Ehrman RN, Childress AR, Bead V, Hackett C, Martz K, Caruso FS, Vocci F, O'Brien CP: Inpatient evaluation of the tolerability of high dose dextromethorphan in methadone-maintained subjects. Presentation for the *Annual Meeting of the College on the Problems of Drug Dependence,* June 2000, San Juan, Puerto Rico

Yu E, Herman BH, Miotto K, Montgomery A, Fudala PJ, Chiang CN, Fisher C, Kampman K, Dhopesh V, Mechanic K, Cornish J, Walsh R, Davies K, Vocci F, Bridge P, Ling W, O'Brien CP: Inpatient safety evaluation of lofexidine (alpha-2 adrenergic agonist) for opiate withdrawal. Presentation for the *Annual Meeting of the College on the Problems of Drug Dependence,* June 2000, San Juan, Puerto Rico

Editorials, Reviews, Chapters, including participation in committee reports:

McLellan AT, O'Brien CP, Metzger D, Alterman AI, Cornish J, Urschel H:  Chapter 14:  How effective is substance abuse treatment - compared to what?  in *Addictive States,* ed. O'Brien CP and Jaffe J. New York, NY, Raven Press, 1991, pp 231-252.

Fischman MW, Jones RJ, Cornish JW: Summary Comments: Acute cocaine intoxication: current methods of treatment. *NIDA Research Monograph*, 123: 183-184, 1992.

Cornish JW, McNicholas L, O'Brien CP:  Chapter 34: Treatment of Substance-Related Disorders, in *American Psychiatric Press Textbook of Psychopharmacology*, ed. Schatzberg AF and Nemeroff CB.  Washington, DC, American Psychiatric Press, 1995, pp 707-724.

Cornish JW, McNicholas LF, O'Brien CP:  Chapter 40: Treatment of Substance-Related Disorders, in *American Psychiatric Press Textbook of Psychopharmacology, Second Edition*, ed. Schatzberg AF and Nemeroff CB.  Washington, DC, American Psychiatric Press, 1998, pp 851-867.

Cornish JW and O'Brien CP: Crack Cocaine Abuse: An epidemic with many public health consequences. *Annual Review of Public Health..* 17:259-273, 1996.

Treatment for Stimulant Use Disorders, *Treatment Improvement Protocol (TIP) Series,* Volume 33. Consensus Panel Chair:  Rawson RA.  Workgroup Leader: Cornish JW. DHHS Publication no. (SMA) 99-3296, 1999.

Cornish JW, McNicholas LF, O'Brien CP:  Chapter 24: Treatment of Substance-Related Disorders, in *The American Psychiatric Press Essentials of Psychopharmacology,* ed. Schatzberg AF and Nemeroff CB.  Washington, DC, American Psychiatric Press, 2000,  pp 519-538.

James W. Cornish, M.D.    CV    April 2008

Cornish JW, McNicholas LF, O'Brien CP:  Chapter 58: Treatment of Substance-Related Disorders, in *American Psychiatric Press Textbook of Psychopharmacology, Third Edition*, ed. Schatzberg AF and Nemeroff CB.  Washington, DC, American Psychiatric Press, 2004, pp 1009-1029.

Cornish JW, McNicholas LF, O'Brien CP:  Chapter 37: Treatment of Substance-Related Disorders, in *The American Psychiatric Press Essentials of Psychopharmacology, Second Edition,* ed. Schatzberg AF and Nemeroff CB.  Washington, DC, American Psychiatric Press, 2006, pp 647-668.

O'Brien CP and Cornish JW:  Principles of the pharmacotherapy of substance abuse disorders, in *Neurobiology of Mental Illness (Second Edition)*, ed. Charney D and Nestler EJ. New York, Oxford University Press, 2004, pp 753-765.


Books:        none

Alternative Media:        none

Patents:        none

Addendum:

**Industrial Experience, the Johnson & Johnson Family of Companies:**

McNeil Pharmaceutical, Spring House, PA

1982-83    Assistant Director, Medical Research and Services
1983-84    Associate Director, Medical Research and Services
            Responsible for Haldol ®, Haldol ® Decanoate, Pimozide, Tylox ®, Tylenol ® with codeine, and Pancrease ®.

Janssen Pharmaceutica, Inc., Piscataway, NJ

1984-88    Project Director, Psychotherapeutics and Anesthesia Departments
            Responsible for Ritanserin, Altanserin, Setoperone, Sibelium ®, Inapsine ®, Innovar®, Sublimaze ®, Sufenta ®, Alfenta ®, and Ketanserin Intravenous.

Report of Dr. Cornish regarding Alan Martin

The opinions listed below are a result of my review of medical records and post mortem report for Alan Martin and a deposition by his sister. Mr. Lightfoot William Lightfootprovided me with these documents for review.

## PRE-MORBID STATE

Prior to the onset of mental illness, Mr. Martin had led a normal and very productive life. By all measures he had successfully negotiated the obstacles of both an undergraduate education at Boston College and a medical education. After earning his Doctor of Medicine degree from Howard University School of Medicine, he entered a residence program in Family Practice. During the first year of residency he developed psychiatric symptoms that lead to his first psychiatric hospitalization in 1973.

Mr. Martin's performance up to 1973 was remarkably good and consistently high level. There is no indication that he had any persistent or significant problems related to his cognitive abilities, mood, interpersonal relations or family relationships.

## MENTAL ILLNESS

Alan Martin first was first hospitalized for psychiatric symptoms at the Freedman's Hospital in Washington, DC in 1973. He had subsequent inpatient treatment for psychiatric disorder at the Psychiatric Institute of Washington, the Providence Hospital in Washington, DC (both in 1973), the Washington Hospital (1975) and Providence in 1977. He had multiple hospitalizations at the Saint Elizabeth's Hospital between 1979 and 2004. His initial psychiatric diagnosis was either Schizophrenia or Schizoaffective Disorder. The patient's definitive diagnosis of Bipolar Disorder was established after several hospitalizations and several psychiatric evaluations including evaluations at the National Institute of Mental Health. The diagnosis has remained the same for more than twenty years. Mr. Martin's past psychiatric history, psychiatric symptoms and response to treatment fulfill the diagnostic criteria for bipolar disorder as described in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (1994).

Mr. Martin's mental illness had an immediate and lasting effect limiting his ability to practice medicine. He had loss of his medical license due to his mental illness. His sister, Theresa Roberson, describes Mr. Martin as being "different" after the onset of his mental illness but she says he maintained his ability to

interact with his family and others. According to this information (which is a longitudinal comparison), Mr. Martin had functioned on a normal range for socialization following the onset of mental illness. The medical records state that between hospitalizations, Mr. Martin had been able to live in supervised housing for many years. He had succeeded in holding a job as a laboratory technician for more than a year. As a laboratory technician he had to follow precise routines, make accurate measurements and execute laboratory procedures in a timely manner. In my professional opinion, his ability to maintain this job is a significant occurrence because it indicates that Mr. Martin was able to have sustained periods of normal function although he never returned to his pre-morbid, high level of function as a medical physician.

Mr. Martin's clinical course (as described in the medical records) was characterized by short periods of profound mental illness separated by long periods of remission of symptoms. Mr. Martin usually had unexpected exacerbations of his psychiatric symptoms that lead to hospitalization. During hospitalization, his symptoms were controlled by a combination of psychiatric medications and psychotherapy. He generally stabilized after hospital admission and then improved up to the time of discharge. His clinical course was typical for Bipolar Disorder in that he had significant loss of function at the time his symptoms were exacerbated but he always returned to his baseline functional level (those residual symptoms that were present following his first few hospitalizations). The fact that bipolar individuals return to their usual level of function following an acute episode is a remarkable feature of the illness. This is the reason that there are many "self-identified" bipolar disordered persons who are able to work and function when they are not ill. A person with bipolar disorder has a good prognosis for interpersonal and cognitive function when he is not acutely ill, when he has infrequent hospitalizations and when he has a stable form of the disorder. Mr. Martin had these attributes and consequently, it is my professional opinion that he had a good prognosis with respect to the future impact of his bipolar disorder. His bipolar disorder had a moderate degree of severity. Since 1973, he has had psychiatric hospitalizations at a rate of less than one per year. His clinical course is not marked by frequent episodes of severe depression or psychotic symptoms. It is also important to note that Mr. Martin's episodes of psychosis were not marked by violence (harm to persons outside of the hospital or to hospital staff). As far as I can determine, he had had no criminal convictions for violent acts.

Psychiatric treatment is a crucial component in the clinical care of a person with bipolar disorder. The combination of mood stabilizing medications and psychotherapy have the dual effect of short-circuiting

2

acute symptoms and preventing the worsening of existing symptoms. Mr. Martin was very compliant with his psychiatric care and it is my medical opinion that this was important in his ability to have a reduced frequency of hospitalizations.

Mr. Martin had been diagnosed at different times as having Alcohol Dependence (1990) or Alcohol Abuse. Most of his later evaluations referred to a diagnosis of Alcohol Abuse. Mr. Martin had received specific treatment for alcohol use (the longest was attendance at Alcoholics Anonymous meetings). Up to 2004, the time of a major head injury, had had sustained long periods of abstinence from alcohol.  His use of alcohol is consistent with the medical knowledge that persons with mood disorders (including bipolar disorder) have a high incidence of substance abuse. These persons generally use alcohol and drugs as a form of "self medication" for psychiatric symptoms.

In 1988, Mr. Martin was diagnosed as having papillary carcinoma of the thyroid gland. He received surgical treatment as thyroidectomy and modified radical neck dissection. Post-operatively to the time of his death he was prescribed thyroid replacement hormone. He had had no evidence of recurrence of the cancer.

## POST-INJURY

On April 1, 2004, Mr. Martin was hospitalized at the St. Elizabeth's Hospital for treatment of acute psychiatric symptoms. On the prior day he had been involved in an incident that required police intervention. During the police investigation, it was apparent that Mr. Martin was experiencing psychiatric symptoms. He was committed to Saint Elizabeth's Hospital for psychiatric treatment. The admission documents indicate that Mr. Martin had psychosis manifested by symptoms of multiple delusions and agitation that severely compromised his ability to correctly recognize reality. These symptoms were similar to prior psychiatric symptoms he had experienced and that had caused past hospitalization for care. For Mr. Martin, this was one of several hospitalizations at St. Elizabeth's.

On April 4, 2004, the medical records state that Pt.#261327 "…who punched Mr. Martin on the head and…started stomping him on the right side of his face and head…" Once the hospital staff recognized this situation they called a code. Mr. Martin received emergency care and was subsequently transferred to Howard University Hospital for intensive care. As a result of this attack, Mr. Martin suffered severe brain injury and was in a coma for a period of two and a half weeks. He also suffered severe and permanent physical injuries, the nature of which I am prepared to discuss.

3

He remained at Howard for several weeks and then was transferred in June 2004 to the Manor Care Nursing Home in Hyattsville, MD. At the time of transfer, Mr. Martin was physically weak, was conscious but unable to communicate. He required supervision and assistance to carry out his basic self-care needs such as eating, bathing and toileting. Mr. Martin never returned to his prior, baseline level of function that was present prior to the attack on April 4, 2004. He remained at Manor Care until his death in March 2005.

Mr. Martin's sister, Mrs. Roberson, gives a description of her brother's condition during his hospitalization at Howard University Hospital and later at the Manor Care Nursing Home. She says that once Mr. Martin came out of his coma, he was awake and responsive but he was not able to communicate with her during his stay at Howard. Mrs. Roberson's description of her brother's condition following his transfer to Manor Care Nursing Home portrays a person who had had a very significant decrement of physical and cognitive functions. The following passage from her deposition exemplifies this: "Yeah. Well, certainly his ability to communicate was severely curtailed. As I say, once he was conscious, the ability to communicate was just very minimal, very – very frustrating for me in trying to figure out what he was saying, and I could see for him, trying to make me understand what he was saying, it just – it just changed 100 percent. Because, again, he wasn't, you know, walking, which is usually how he came to our house, and sitting and laughing, always – and he'd laugh – you know, visiting with my mother and chatting, you know, and watching TV and maybe commenting on something on TV.
And then, of course, after the attack he basically was just in a hospital bed or in a wheelchair and just kind of sitting and -- and really not interested in anything."

Mr. Martin had regular visits from his sister during his stay at Howard University Hospital and at the Manor Care Nursing Home. His sister says that his mother made a few visits with Alan when he was at Howard. "…I stopped taking my mother after the first few visits… It was too hard." This is a very important development because Mr. Martin throughout his life had stayed close to his mother. It is impossible to know that Mr. Martin understood why his mother did not visit him.

I believe that Mr. Martin's medical education served him badly after his coma. He had been taught in medicine to consider all the possibilities when making a prognosis. He certainly had a particular understanding of his own condition and I believe he realized that he had suffered serious brain damage. Even after he had developed mental illness, he had preserved his ability to communicate and socialize, especially with his family. He had real reasons for frustration, hopelessness and depression (apart from

4

bipolar disorder). As a consequence of the beating incident on April 4, 2004, Mr. Martin had subsequently loss his ability to communicate and to walk. He also lost the attention and comfort of his mother.

What would have been his life expectancy had he not been injured by the physical attack on April 4, 2004? Persons with Mood Disorder, which include Bipolar Disorder, have been reported (see attached article from the American Journal of Psychiatry) to have a decreased life expectancy compared to individuals in the general population who do not have mood disorder. Persons with Mood Disorder are reported to die at rate of approximately 1.5 times the rate for the general population. Most of the increased deaths in Mood Disorder occur at younger ages. Persons who reach middle age have improved chances of living normal lives. Geriatric facilities have a large number of elderly persons who have Mood Disorder.

In my professional opinion, Mr. Martin had a very good prognosis for reaching old age. He had a moderate intensity of bipolar disorder, infrequent hospitalizations, consistent psychiatric care and freedom from major medical disease. He had had thyroid cancer that had been successfully treated in 1988 and he had had no evidence of recurrence of this cancer. His post-mortem examination did not reveal any evidence of thyroid cancer. His psychiatric clinical course was not marked by frequent occurrences of suicidal thoughts or suicide attempts. Consequently, Mr. Martin had no medical problems to shorten his life prior to being injured on April 4, 2004. Mr. Martin had always returned to his baseline of mental function following each of his hospitalizations. Therefore, I opine that he would have continued his usual clinical pattern and would have maintained his level of function, communication and socialization that he had had during periods of remission of his bipolar disorder symptoms.

I declare under penalty of perjury that the foregone is true and correct based upon my knowledge and information.


James W. Cornish, M.D.

June 16, 2008

*Regular Articles*

# Mortality of Elderly Patients With Psychiatric Disorders

**George S. Zubenko, M.D., Ph.D., Benoit H. Mulsant, M.D., Robert A. Sweet, M.D., Rona E. Pasternak, M.D., and Xin Ming Tu, Ph.D.**

*Objective: The goal of this study was to evaluate the impact of common late-life mental disorders on the life expectancy and causes of death of older psychiatric patients. Method: The study population consisted of 809 older psychiatric patients who met DSM-III-R criteria for organic mental disorders, mood disorders, or psychotic disorders and who were discharged after a comprehensive multidisciplinary evaluation and acute inpatient treatment for their behavioral disorders. Dates and causes of death during a 5.75-year follow-up period were provided by the Pennsylvania Department of Health. Univariate and multivariate survival procedures were used to compare the survival rates of the three groups to each other and to a reference population of Pennsylvania residents. Causes of death were also tabulated according to ICD-9-CM and compared across the groups. Results: Age, gender, race, and medical comorbidity made significant independent contributions to survival. When these variables were controlled, the survival of patients with organic mental disorders was less than half of that for patients with mood or psychotic disorders. However, all three groups experienced higher rates of mortality than the reference population, with standardized mortality ratios of 1.5 to 2.5. Deaths occurred from the usual spectrum of natural causes, with the exception that patients with mood disorders were more likely to have died from disorders of the digestive system and suicide. Conclusions: The mental disorders of late life have a significant negative impact on the survival of older psychiatric patients.*

(Am J Psychiatry 1997; 154:1360–1368)

We are witnessing the aging of the American population, as the number and proportion of older individuals continue to grow (1). With increasing expectations of longevity, even for those who have already entered into later life, the proportion of the entire lifespan spent in old age is also expanding. The appreciation of these population dynamics has had a substantial impact on biomedical research as well as health care policy, with increasing attention being focused on the concept of successful aging (2–4).

Mental disorders are common in late life and are a formidable obstacle to successful aging. Progressive dementias, the most common of which is Alzheimer's disease, affect approximately 7.5% of individuals who are 65 or older and 20% of those over the age of 80 (5, 6). While a number of the behavioral complications of Alzheimer's disease and related dementias are potentially treatable (7, 8), most dementing disorders are irreversible and progressive and have tragic consequences for patients and their families (9). Mood disorders appear to affect 2% to 4% of community-dwelling elders (10), and the proportion of older individuals who manifest depressive symptoms sufficient to be of clinical importance has been estimated to be between 10% and 15% (11). While the recovery of older depressed patients in response to vigorous treatment may approximate that of younger patients (12, 13), the elderly appear to be more prone to relapse (14, 15). In addition to substantial prevalence rates among elders in the community, cognitive and mood disorders are the most common disorders among older patients treated in geropsychiatric settings (16–20) and among nursing

Received Dec. 10, 1996; revision received March 27, 1997; accepted April 25, 1997. From the Department of Psychiatry, Western Psychiatric Institute and Clinic, School of Medicine, and Department of Mathematics and Statistics, University of Pittsburgh. Address reprint requests to Dr. Zubenko, Western Psychiatric Institute and Clinic, Rm. E-1230, 3811 O'Hara St., Pittsburgh, PA 15213.

Supported by NIMH research project grant MH-43261 and center grant MH-30915, NIMH Independent Scientist Award MH-00540 (Dr. Zubenko), and NIMH Scientist Development Award for Clinicians MH-01153 (Dr. Sweet).

These data were supplied by the State Health Data Center, Pennsylvania Department of Health, Harrisburg. The Pennsylvania Department of Health specifically disclaims responsibility for any analyses, interpretations, or conclusions.

home residents (21–23). Anxiety disorders and alcohol and drug abuse have been reported to affect a small percentage of elders (24–26) but appear to be underrepresented among the primary diagnoses of patients in clinical geropsychiatric populations (20). The prevalence of primary psychotic disorders diminishes with age (27–30), with schizophrenia and primary persistent paranoid disorders affecting less than 0.5% of older adults (10, 31). Thoughts about suicide and suicide attempts are less common in the elderly than in younger age groups (32–34). However, suicide rates climb with age, and suicide has been reported to account for 50 per 100,000 deaths among elderly white men (34).

Much has been written on the complex interactions of mental illness, physical health, and disability among the elderly. In addition, subjective self-assessments of health have consistently been found to predict mortality in this age group (4, 35–38). However, the effects of the major late-life mental disorders on the survival of older Americans who suffer from these conditions have not been systematically studied. The goal of the current study was to assess the independent effects of organic mental disorders, mood disorders, and psychotic disorders, as described in DSM-III-R, on the survival rates of 809 elderly inpatients following acute inpatient treatment for these disorders.

## METHOD

### Patient Population and Characterization

A total of 869 elderly patients were admitted to the Geriatric Clinical Research Unit of Western Psychiatric Institute and Clinic between Sept. 1, 1989, and June 30, 1993. For those patients among the 869 who were admitted more than once during this interval, the first admission served as the index admission. Each patient underwent detailed neurological, medical, psychiatric, and laboratory examinations, as previously described (7, 13, 20). The number and severity of psychiatric signs and symptoms were determined by using the Brief Psychiatric Rating Scale (39) and the 17-item Hamilton Rating Scale for Depression (40, 41). Cognitive performance was assessed with the Mini-Mental State (42). The diagnostic criteria for DSM-III-R were subsequently applied at regularly scheduled consensus conferences attended by faculty psychiatrists (including each patient's attending psychiatrist), one of whom was also board-certified in internal medicine, and by research staff members, all with specialized expertise in geriatric psychiatry. The age at first onset of each primary diagnosis was determined at the same diagnostic consensus conference at which each patient's active medical problems were also reviewed. Diagnostic assessments were based on clinical, historical, and laboratory data from all available sources. The data presented in this study were prospectively obtained as part of a clinical investigation of elderly patients admitted to the Geriatric Clinical Research Unit, according to a protocol approved by the Biomedical Institutional Review Board of the University of Pittsburgh. This protocol was found to be exempt for the need for written informed consent by the institutional review board.

For each patient, a multidisciplinary diagnostic assessment was made, and active medical problems that were the focus of investigation or treatment were classified according to ICD-9-CM. Since all subjects included in this study were psychiatric inpatients, medical problems in the ICD-9-CM categories mental disorders and diseases of the nervous system and sense organs were not counted in order to avoid redundancy. The resulting total number of medical problems served as an index of medical burden. The validity of this index of medical burden is supported by several lines of evidence. First, the number of medical prob-

### TABLE 1. DSM-III-R Primary Diagnoses Among 809 Elderly Psychiatric Patients

| Diagnosis | N | % |
|---|---|---|
| Organic mental disorders | 399 | 100.0 |
| Primary degenerative dementia, Alzheimer type | 196 | 49.1 |
| Multi-infarct dementia | 55 | 13.8 |
| Dementia | 46 | 11.5 |
| Organic mood disorder | 36 | 9.0 |
| Delirium | 28 | 7.0 |
| Other[a] | 38 | 9.5 |
| Mood disorders | 322 | 100.0 |
| Major depression | 254 | 78.9 |
| Bipolar disorder | 62 | 19.3 |
| Other[b] | 6 | 1.9 |
| Psychotic disorders | 88 | 100.0 |
| Schizophrenia | 44 | 50.0 |
| Schizoaffective disorder | 29 | 33.0 |
| Delusional disorder | 10 | 11.4 |
| Psychotic disorder not otherwise specified | 5 | 5.7 |

[a]Organic mental disorder not otherwise specified, N=11; organic delusional disorder, N=7; organic hallucinosis, N=6; organic personality disorder, N=6; amnestic disorder, N=2; other psychoactive substance-induced organic mental disorder not otherwise specified, N=2; alcohol intoxication, N=2; alcohol hallucinosis, N=1; hypersomnia or insomnia related to a known organic factor, N=1.

[b]Depressive disorder not otherwise specified, N=3; dysthymia, N=3.

lems was significantly correlated with the scores of elderly depressed inpatients on the CIRS(G) (41), a version of the Cumulative Illness Rating Scale operationalized for use in geriatric patients (43). Moreover, the number of medical problems determined by this approach has been reported to predict poor treatment response among elderly inpatients with major depression (13). A similar index of physical comorbidity has been used to compare and contrast the medical burden suffered by psychiatric outpatients with Alzheimer's disease, major depression, and schizophrenia (44). Finally, the number of ICD-9-CM medical problems was used to characterize the medical burden of patients included in the National Hospital Discharge Survey compiled by the Centers for Disease Control and National Center for Health Statistics (45). A systematic description of the medical comorbidity of this study population has been previously published (20).

Of the 869 inpatients who were characterized, 809 (93.1%) were Pennsylvania residents and met DSM-III-R criteria for a primary psychiatric diagnosis within the categories of organic mental disorders (N=399), mood disorders (N=322), or psychotic disorders (N=88). The remaining 60 inpatients included 13 who were discharged to dispositions outside of Pennsylvania and 47 Pennsylvania residents who constituted a small and diagnostically heterogeneous residual group. Data and causes of death were determined for the 809 patients by using data supplied by the State Health Data Center, Pennsylvania Department of Health, Harrisburg, covering the period from Sept. 1, 1989, through May 30, 1995. For patients in whom a dementing disorder was identified as the cause of death, death certificates and available health records were reviewed to identify the medical problem that constituted the proximate cause of death. For each patient, the duration of follow-up was defined by the interval between the date of discharge from the index admission until the date of death, or the end of the surveillance period (May 30, 1995), whichever came first.

### Statistical Analysis

Comparisons of continuous sociodemographic and clinical variables among and between the three patient groups were made with analyses of variance, followed by Tukey honestly significant difference post hoc tests. Comparisons of categorical clinical variables were made by using the chi-square statistic. Survival rates during the 5.75-year surveillance period were determined for the members of the three diagnostic groups with the Kaplan-Meier product limit method. A best-fitting Cox proportional hazards model was devel-

TABLE 2. Sociodemographic and Clinical Characteristics of 809 Elderly Psychiatric Patients

| Characteristic | Total (N=809) | | Organic Mental Disorders (N=399) | | Mood Disorders (N=322) | | Psychotic Disorders (N=88) | | Analysis | | | Significant Pairwise Comparisons[a] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | $\chi^2$ | df | p | |
| Sex | | | | | | | | | 10.05 | 2 | 0.007 | Psychotic versus all groups |
| Female | 544 | 67.2 | 253 | 63.4 | 220 | 68.3 | 71 | 80.7 | | | | |
| Male | 265 | 32.8 | 146 | 36.6 | 102 | 31.7 | 17 | 19.3 | | | | |
| Race | | | | | | | | | 24.32 | 2 | <0.001 | All pairwise comparisons |
| Black | 116 | 14.3 | 61 | 15.3 | 29 | 9.0 | 26 | 29.5 | | | | |
| White | 693 | 85.7 | 338 | 84.7 | 293 | 91.0 | 62 | 70.5 | | | | |
| Marital status | | | | | | | | | 45.54 | 4 | <0.001 | All pairwise comparisons |
| Married | 300 | 37.1 | 138 | 34.6 | 148 | 46.0 | 14 | 15.9 | | | | |
| Other | 424 | 52.4 | 225 | 56.4 | 148 | 46.0 | 51 | 58.0 | | | | |
| Never married | 85 | 10.5 | 36 | 9.0 | 26 | 8.0 | 23 | 26.1 | | | | |
| Widowed | | | | | | | | | 18.31 | 2 | <0.001 | Organic versus all groups |
| Yes | 318 | 39.3 | 185 | 46.4 | 110 | 34.2 | 23 | 26.1 | | | | |
| No | 491 | 60.7 | 214 | 53.6 | 212 | 65.8 | 65 | 73.9 | | | | |
| Died during follow-up | 265 | 32.8 | 180 | 45.1 | 71 | 22.0 | 14 | 15.9 | 55.76 | 2 | <0.001 | Organic versus all groups |

| Characteristic | Mean | SD | Mean | SD | Mean | SD | Mean | SD | F | df | p | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Education (years)[b] | 11.2 | 3.5 | 10.9 | 3.6 | 11.6 | 3.2 | 11.1 | 3.4 | 3.72 | 2, 795 | 0.02 | Organic versus mood disorders |
| ICD-9-CM medical problems | 5.6 | 3.1 | 5.8 | 3.1 | 5.6 | 3.1 | 4.7 | 3.2 | 4.74 | 2, 806 | 0.009 | Psychotic versus all groups |
| Age at onset (years)[c] | 61.9 | 19.0 | 72.1 | 12.2 | 55.8 | 18.0 | 38.5 | 17.2 | 214.88 | 2, 800 | <0.0001 | All pairwise comparisons |
| Age at discharge (years) | 73.2 | 9.4 | 76.7 | 8.8 | 71.0 | 8.3 | 65.3 | 8.7 | 81.23 | 2, 806 | <0.0001 | All pairwise comparisons |
| For deceased patients, age at death (years) | 78.3 | 8.8 | 79.8 | 8.2 | 75.7 | 9.2 | 72.5 | 9.1 | 9.47 | 2, 262 | 0.0001 | Organic versus all groups |

[a] $p<0.05$.
[b] Education, N=798: organic mental disorders, N=390; mood disorders, N=320; psychotic disorders, N=88.
[c] Age at onset, N=803: organic mental disorders, N=394; mood disorders, N=322; psychotic disorders, N=87.

oped to compare the survival rates among the members of the three groups, while differences in sociodemographic variables and medical comorbidity were controlled. Expected numbers of deaths during the average follow-up intervals of each group were determined by using data reported for Pennsylvania and in the U.S. Decennial Life Tables (46). These estimates were age specific and weighted to match the sex ratios and proportions of Caucasian and black patients in each diagnostic group. Comparisons of the proportions of observed and expected deaths were made with the chi-square statistic. Causes of death were tabulated according to ICD-9-CM categories, and their frequencies were compared between diagnostic groups with the chi-square statistic or Fisher's exact test, as appropriate. Statistical analyses were performed through use of the BMDP Statistical Software package, 1990 revision.

RESULTS

The 809 elderly psychiatric inpatients in the study included approximately twice as many women (N=544) as men (N=265) and a representative proportion of black subjects (N=116, 14.3%). Most patients (N=724, 89.5%) had been married, and over one-third (N=318, 39.3%) were widowed at the time of their index admission. The study population was reasonably well educated on average, as reflected by the completion of a mean of 11.2 years (SD=3.5) of education. As previously described (20), they suffered from a marked level of medical comorbidity, as reflected by a mean of

5.6 active ICD-9-CM medical problems (SD=3.1). Their mean age was 61.9 years (SD=19.0) at the onset of their primary psychiatric disorder and 73.2 years (SD=9.4) at the time of discharge from the index admission, when follow-up was initiated. Approximately one-third of the study population died during the 5.75-year surveillance period. During this interval, each patient was tracked for an average of 3.1 years (SD=1.6); the mean age at death was 78.3 years (SD=8.8).

The study population consisted of three diagnostic groups as described in DSM-III-R: organic mental disorders (N=399, 49.3%), mood disorders (N=322, 39.8%), and psychotic disorders (N=88, 10.9%). As shown in table 1, primary degenerative dementia of the Alzheimer type, major depression, and schizophrenia were the most common primary diagnoses of patients in these three respective diagnostic groups. A sociodemographic and clinical description of these diagnostic groups is presented in table 2. The patients with organic mental disorders had the oldest mean ages at onset and at time of discharge. As a result, they included the highest proportion of widows and widowers. Patients in this group also had the lowest mean number of years of education, although the differences among the diagnostic groups were of unlikely practical significance. The group with mood disorders included the lowest proportion of black subjects and the highest

FIGURE 1. Kaplan-Meier Survival Analysis Depicting Survival Rates for Elderly Patients With Organic Mental Disorders, Mood Disorders, and Psychotic Disorders[a]



[a]Significant differences among the survival curves for the three groups (Mantel-Cox statistic=63.8, df=2, p<0.0001; Breslow statistic=64.8, df=2, p<0.0001).

FIGURE 2. Multivariate Cox Proportional Hazards Models Depicting Survival Rates for Elderly Patients With Organic Mental Disorders, Mood Disorders, and Psychotic Disorders[a]



[a]Corrected for differences in sociodemographic variables and medical comorbidity (table 3).

TABLE 3. Multivariate Cox Proportional Hazards Model Predicting Survival Among 809 Elderly Psychiatric Patients

| Variable[a] | Risk Ratio | 95% Confidence Interval | p |
|---|---|---|---|
| Age | 1.04 | 1.02–1.05 | 0.0001 |
| Sex | 2.02 | 1.58–2.59 | 0.0001 |
| Race | 0.45 | 0.28–0.71 | 0.0006 |
| Medical burden | 1.09 | 1.05–1.14 | 0.0001 |
| Mood disorder | 0.46 | 0.35–0.62 | 0.0001 |
| Psychotic disorder | 0.47 | 0.27–0.83 | 0.009 |

[a]The variables were coded as follows: age (years), sex (female=0, male=1), race (Caucasian=0, black=1), medical burden (number of active ICD-9-CM medical problems), mood disorder (absent=0, present=1), psychotic disorder (absent=0, present=1). Goodness-of-fit $\chi^2$=147.39, df=6, p=0.0001.

proportion of married subjects and had a mean age at onset in middle age. The group with psychotic disorders included the highest proportions of women, blacks, and unmarried subjects; had the lowest ages at onset and at discharge; and suffered from the least medical comorbidity. Nearly half of the patients in the organic mental disorders group died during the follow-up period, compared with only one-fifth of the patients with mood or psychotic disorders. The different proportions of patients in each diagnostic group who died during the surveillance period accounted for the differences in the mean lengths of follow-up for each group.

Survival analysis was performed for the three groups by using the Kaplan-Meier product limit method. This analysis reflected the actual survival rates, uncorrected for intergroup differences in sociodemographic variables and medical comorbidity, observed for these groups during the surveillance period. As shown in figure 1, the survival rate for the patients with psychotic disorders was initially somewhat higher than that for the patients with mood disorders. However, this modest difference disappeared altogether by the end of the surveillance period, at which time 71% to 72% of the patients in both groups remained alive. In contrast, patients with organic mental disorders died at a considerably faster rate; only 44.1% survived beyond the fifth year of follow-up.

A best-fitting Cox proportional hazards model was developed to compare the survival rates among the three groups; differences in sociodemographic variables and medical comorbidity were controlled. The use of forward selection and backward elimination procedures produced identical models. Not surprisingly, younger age, female gender, and lower medical burden were associated with significant independent effects favoring longevity (table 3). As a group, black patients also lived longer than Caucasian patients. After control for the independent effects of these variables, patients with mood or psychotic disorders exhibited significantly greater survival than those with organic mental disorders and were indistinguishable from each other in this regard (table 3, figure 2).

Mortality rates for patients in the three groups were compared to those expected for Pennsylvania residents. Expected numbers of deaths during the mean follow-up intervals for each diagnostic group were determined by using data reported for Pennsylvania residents in the U.S. Decennial Life Tables (46). These estimates were

MORTALITY OF ELDERLY PATIENTS

TABLE 4. Causes of Death by ICD-9-CM Category for 265 Deceased Elderly Psychiatric Patients[a]

| Category | Total (N=265) | | Organic Mental Disorders (N=180) | | Mood Disorders (N=71) | | Psychotic Disorders (N=14) | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| Infectious and parasitic diseases | 16 | 6.0 | 12 | 6.7 | 4 | 5.6 | 0 | 0.0 |
| Neoplasms | 29 | 10.9 | 17 | 9.4 | 10 | 14.1 | 2 | 14.3 |
| Endocrine, nutritional, and metabolic diseases | 7 | 2.6 | 6 | 3.3 | 1 | 1.4 | 0 | 0.0 |
| Diseases of the circulatory system | 121 | 45.7 | 84 | 46.7 | 33 | 46.5 | 4 | 28.6 |
| Diseases of the respiratory system | 54 | 20.4 | 38 | 21.1 | 12 | 16.9 | 4 | 28.6 |
| Diseases of the digestive system[b] | 10 | 3.8 | 3 | 1.7 | 5 | 7.0 | 2 | 14.3 |
| Diseases of the genitourinary system | 5 | 1.9 | 5 | 2.8 | 0 | 0.0 | 0 | 0.0 |
| Symptoms, signs, and ill-defined conditions | 7 | 2.6 | 3 | 1.7 | 2 | 2.8 | 2 | 14.3 |
| Suicide[c] | 3 | 1.1 | 0 | 0.0 | 3 | 4.2 | 0 | 0.0 |
| Other external causes[d] | 3 | 1.1 | 3 | 1.7 | 0 | 0.0 | 0 | 0.0 |
| Unknown | 10 | 3.8 | 9 | 5.0 | 1 | 1.4 | 0 | 0.0 |

[a]Because of the relatively few deaths among patients with psychotic disorders, statistical comparisons were made only for patients with organic mental disorders and those with mood disorders (chi-square analysis or Fisher's exact test, as appropriate, two-tailed, df=1).

[b]Significant difference between organic mental disorders and mood disorders (p=0.04, Fisher's exact test).

[c]Significant difference between organic mental disorders and mood disorders (p=0.02, Fisher's exact test).

[d]Unspecified fall, N=1; late effects of unspecified accident, N=2.

age specific and weighted to match the sex ratios and proportions of Caucasian and black patients in each group. With this approach, 71, 47, and eight deaths would have been expected among the patients with organic mental disorders, mood disorders, and psychotic disorders, respectively; 180 ($\chi^2$=69.06, df=1, p< 0.0001), 71 ($\chi^2$=5.98, df=1, p=0.01), and 14 ($\chi^2$=1.47, df=1, p=0.17) deaths were observed. The corresponding standardized mortality ratios (observed/expected) for these diagnostic groups during their respective mean follow-up intervals were 2.5, 1.5, and 1.8, compared to elderly Pennsylvanians of comparable age, gender, and race.

Causes of death were obtained from the Pennsylvania Department of Health for over 95% of the 265 patients who died during the surveillance period. Causes of death were tabulated for each group according to the ICD-9-CM categories and are presented in table 4. Diseases of the circulatory and respiratory systems, along with neoplasms, were the most common causes of death and accounted for over three-quarters of all deaths. Because of the relatively few deaths (N=14) among the patients with psychotic disorders, statistical comparisons were made only between the groups with organic mental disorders and mood disorders. The proportions of deaths from each cause were similar in these two groups, with two exceptions. While only 3.8% of all patients died from diseases of the digestive system, the rate of deaths from this cause was over four times higher among the patients with mood disorders than among those with organic mental disorders. The specific causes of death listed for the 10 patients who died from diseases of the digestive system were peritonitis (N=3), intestinal obstruction (N=2), vascular insufficiency of the intestine (N=1), volvulus (N=1), pep-

tic ulcer disease (N=1), cirrhosis of the liver (without mention of the use of alcohol, N=1), and unspecified disorders of the intestine (N=1). In addition, all three of the deaths by suicide occurred among male Caucasians whose primary psychiatric diagnosis during their index psychiatric admissions was major depression without psychotic features (one single episode, two recurrent).

DISCUSSION

Following discharge from an inpatient geropsychiatric setting, elderly patients who had an organic mental disorder died at a substantially higher rate than those with mood or psychotic disorders. This finding was robust and persisted even after corrections were made for intergroup differences in sociodemographic variables and medical comorbidity. Approximately three-quarters of the patients in the group with organic mental disorders suffered from dementia, and the survival of this group was consistent with the average 75% 2-year survival rate reported in previous studies of demented outpatients (for review see reference 47). Not surprisingly, the reported survival rates for patients with dementia have reflected the progressive nature of most dementias and parallel the level of cognitive and functional impairment of the populations studied. Over a 5-year interval, the standardized mortality rates (observed deaths/expected deaths) for demented subjects living in the community, nursing homes, and long-term hospitals have been reported to be 1.3, 2.0, and 3.7, respectively (for review see reference 47). The standardized mortality rate of 2.5 observed for the patients from our study population with organic mental disorders is consistent with this range of estimates.

The reported survival rates of demented patients with Alzheimer's disease or vascular dementia have been similar, with only a modestly lower rate of survival (5% to 15% differential over 2 years) for patients with multi-infarct dementia (48–54). In our study population, 56.6% of patients with Alzheimer's disease were alive at the end of the surveillance period, compared to 45.5% of patients with multi-infarct dementia. Patients with dementias of mixed or uncertain etiologies also had a poor survival rate; only 50.0% were alive at the end of the surveillance period. Patients with a primary diagnosis of delirium had the poorest survival (43.4%), a finding that is consistent with the unfavorable prognosis for patients who pre-

ZUBENKO, MULSANT, SWEET, ET AL.

TABLE 5. Survival Rates Reported for Older Patients With Primary Mood Disorders

| Study | Population | Survival Rate (%) | | | | | | | Standardized Mortality Ratio |
| | | 6 Months | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years | 6 Years | |
|---|---|---|---|---|---|---|---|---|---|
| Roth (16), 1955 | Index psychiatric admissions, N=260; affective psychosis, N=220 | 89 | — | 81 | — | — | — | — | |
| Kay et al. (17), 1955 | Index psychiatric admissions, age ≥60; affective disorders, N=189 | — | — | 85 | — | — | — | — | |
| Kay (18), 1962 | Index psychiatric admissions, age >60; nondemented, N=154 (affective disorders, N=97; late paraphrenia, N=57) | — | 89 | — | 74 | — | 67 | — | 1.4 |
| Avery and Winokur (56), 1976[a] | Index psychiatric admissions, age ≥60; primary affective disorder (Feighner criteria), N=147 | — | 85–97[a] | — | 81–92[a] | — | — | — | |
| Murphy et al. (57, 58), 1983 | Index psychiatric admissions, age ≥65; primary depression (Feighner criteria), N=124 | — | 86 | — | — | 66 | — | — | |
| Baldwin and Jolley (59), 1986 | Index psychiatric admissions, age >65; primary depression (Feighner criteria), N=100 | — | 92 | — | — | — | — | — | |
| Murphy et al. (60), 1987 | General population sample (Sterling County in Canada), age ≥70 at death; affective disorders diagnosed from responses to questionnaires | — | — | — | — | — | — | — | 1.6 |
| Robinson (19), 1989 | Patients consecutively referred to psychogeriatric unit, age >65; depressive illness, N=46 | — | — | 65 | — | — | 43 | — | 1.2–1.6 |
| Philbert et al. (61), 1995[b] | Index psychiatric admissions, age ≥65; DSM-III major depression, N=192 | — | 85–94 | 78–85 | 73–83 | 71–81 | 65–80 | 62–78 | — |
| Current study | Index psychiatric admissions, mean age=73; DSM-III-R mood disorders, N=322 | — | 93 | 86 | 81 | 80 | 74 | 71 | 1.5 |
| Summary[c] | | 89 | 85–97 | 81–86 | 74–92 | 80 | 67–74 | 71 | 1.2–1.6 |

[a]Values reflect ranges for patients who received "adequate" or "inadequate" treatment for depression. Adequate treatment was associated with greater survival.
[b]Values reflect ranges for patients who were or were not treated with ECT. Those who received ECT survived longer.
[c]Excludes outlying survival rates reported by Robinson (19).

sent with delirium in general medical settings (54, 55). The survival rate for patients with organic mood disorders (61.1%) was intermediate between the overall rates for patients with organic mental disorders (54.9%) and mood disorders (78.0%). The last finding may be attributable to the common comorbid diagnosis of cerebrovascular disease among the patients with organic mood disorder.

Published mortality data for older patients with primary mood disorders are sparse. A comparison of survival rates reported for older patients with mood disorders is presented in table 5. Seven of the 10 published studies were conducted in Europe, beginning with the landmark article by Roth in 1955 (16). In all seven of these investigations, the study populations were identified by index admissions to psychiatric settings. While diagnostic criteria varied among these studies, consistent efforts were made to classify patients with functionally significant cognitive impairment or evidence of organic etiology separately from those with other "functional" mental disorders. Diagnoses of affective disorders were generally made by using criteria similar to those for mood disorders in DSM-III-R, and later studies employed Feighner criteria (62) for primary affective disorders. In the two reports from Iowa, both Avery and Winokur (56) and Philbert et al. (61) observed a positive effect of treatment on the survival of a mixed-age population of depressed inpatients. Murphy and colleagues (60) studied the effects of affective disorders (diagnosed by questionnaires) on the survival of a general population sample recruited as part of the Sterling County (Canada) Study.

There was reasonably good agreement among the studies of survival rates reported in table 5, with the exception of one outlier. The older depressed patients described by Robinson (19) died at a rate nearly twice that reported in the remainder of the studies. This may have reflected an older, more severely affected patient population with greater medical comorbidity or less vigorous treatment for depression. As an example of the latter possibility, the 2-year survival for patients in that study rose to 80% for patients who received ECT; there were similar gains in survival in subsequent years of follow-up. However, the consistency of standardized mortality ratios across the studies (1.2 to 1.6) suggests that at least some of the variance resulted from regional

or epochal differences in the survival of the general populations from which the patients were drawn.

In addition to these reports, two studies have explored the relationship of major depression to survival among institutionalized individuals who were older on average than those described in table 5, in poor health, functionally impaired, and who manifested varying degrees of cognitive impairment including dementia. As expected, these multiply disabled populations of frail elders died at high rates. In a study of 454 residents of eight nursing homes in the Baltimore area, Rovner and colleagues (63) observed a 1-year survival rate of only 53% for the 57 residents who met DSM-III criteria for major depression. Moreover, the presence of major depression remained an independent predictor of survival after control for the effects of sociodemographic variables, functional disability, and hospitalization during the year. In a study of 898 institutionalized aged, Parmelee and co-workers (22, 64) reported 6-, 12-, and 18-month survival rates of 81%, 79%, and 67%, respectively, for an initial subgroup of 116 residents who met DSM-III-R criteria for probable major depression. In contrast to the former report, probable major depression did not emerge as an independent predictor of survival in the multiply disabled population of frail elderly followed by Parmelee and co-workers, after control for the effects of physical health, functional disability, and cognitive dysfunction. It is possible that the greater mortality associated with major depression in the latter study may have been mediated exclusively through these comorbid factors. Alternatively, the ability to detect risk factors whose effects on mortality are modest may be diminished in studies of very old, frail elders who suffer from high rates of mortality from multiple potent causes.

Published studies of the survival of patients over age 60 who suffer from primary psychotic disorders are rare, indeed. One reason for this is that such patients represent only a very small proportion of most populations and are uncommon even among older clinical populations. As an example, they accounted for only 11% (N=88) of the study population described in this report. Half of these patients suffered from schizophrenia, and, consistent with the estimates of Harris and Jeste (65), only six (all women) experienced onset after age 45. While decreased need for, or at least utilization of, mental health resources may contribute to this phenomenon, the survival of young patients with schizophrenia and other primary psychotic disorders into their 40s and 50s is greatly diminished by death from both natural and unnatural causes (27–30). Roth (16) reported 96% and 79% survival rates after 6 months and 2 years of follow-up of 45 paraphrenic patients over the age of 60. These survival estimates are substantially below those observed for the patients with psychotic disorders in the current study. In contrast, Kay (18) reported a standardized mortality ratio of only 1.2 (that did not significantly differ from 1.0) for 57 patients over age 60 who had late paraphrenia. The standardized mortality ratio of 1.8 observed for our group of older patients with psychotic disorders did not reach statistical significance, most likely because of the relatively small number of deaths that occurred in this group (N=14). This inference is supported by the results of our proportional hazards analysis, which revealed indistinguishable relative risks of mortality associated with mood and psychotic disorders. Further studies will be required to definitively address this issue.

Even after control for differences in sociodemographic variables and medical burden, our results reflect substantially lower life expectancies for patients with organic mental disorders than for patients with mental disorders that arise from unidentified etiologies. However, it is important to recognize that the absolute and relative survival rates reported for the psychiatric groups in this study are age specific. The negative impact of both major depression and schizophrenia on survival is greatest in younger age groups and attenuates with advancing age (27–30, 56, 60). From the perspective of the entire lifespan, these disorders have effects on reducing survival in younger patients that may equal or exceed those associated with the organic mental disorders in older patients.

The observation that younger age, female gender, and lower medical burden were significant independent predictors of survivorship in this study population was consistent with our expectations (1, 46). However, the observation that black patients lived longer on average than Caucasian patients would not have been predicted by census data indicating that black and other minority residents have higher age-specific mortality rates, even among those who survive into their 60s and 70s (1, 46). This counterintuitive finding may be attributable to different patterns of health resource utilization that lead to a higher proportion of treatment-refractory cases among Caucasian patients. In a previous study of this patient population, black patients with major depression were significantly less likely to have received outpatient treatment before their index hospital admission than similarly depressed Caucasian patients (13). As a result, black inpatients were significantly more likely to experience the resolution of their depressive symptoms than Caucasian patients who were typically admitted after an unsuccessful course of outpatient treatment. This differential pattern of resource utilization seems unlikely to be restricted to patients with major depression and may have led to a higher proportion of Caucasian patients in our study population with treatment-refractory mental disorders. If this phenomenon accounts for the differential survival between black and Caucasian patients, it implies that unresponsiveness to treatment may be an additional risk factor for mortality in this population.

The most common ICD-9-CM causes of death for patients in all three diagnostic groups were diseases of the circulatory system, diseases of the respiratory system, and neoplasms. These represent the most common natural causes of death for individuals in this age range (1, 46). While diseases of the digestive system were uncommon (3.8%) causes of death in this study population, they were over four times more likely to have been

the cause of death for patients with mood disorders than for patients with organic mental disorders. This observation supports the validity and increases the significance of our reported finding of a greater prevalence of comorbid diseases of the digestive system among older patients with mood disorders (especially major depression) than in the other two groups (20). This association was observed during the index admission of the patients described in this study and was not readily attributed to differences in prescribed medications. Instead, it may reflect peripheral autonomic dysregulation among elderly patients with major depression that produces both greater morbidity and mortality, a phenomenon that warrants further study (66–68).

Suicide was a rare cause of death, accounting for only three (1.1%) of all 265 deaths. Consistent with the epidemiology of late-life suicide, all three were male Caucasians (34). Moreover, all had suffered from major depression during their index admissions. This observation is consistent with our previous report of a low prevalence of suicide attempts among patients with organic mental disorders (69) and with the published observation that the prevalence of suicide among patients with primary psychotic disorders declines with age and is rare among schizophrenic patients over age 50 (27–30).

Several issues regarding our methodology and the interpretation of our findings warrant further consideration. Since date and cause of death were obtained from the Pennsylvania Department of Health, the deaths of any residents who may have relocated outside of Pennsylvania would have escaped detection. This phenomenon is unlikely to have substantively affected our results because the population of western Pennsylvania is remarkably stable (70, 71) and because the lack of detection of deaths among the study population would have increased the apparent survival rates of the patient groups rather than decreasing them. Moreover, the reported dates and causes of death were supported by good agreement of these data with the medical records of individuals whose primary care was provided at our medical center, as well as with the axis III diagnoses of the patients during their index psychiatric admissions. Finally, it should be noted that our study population was identified by consecutive, nonduplicated index admissions to an inpatient geropsychiatric unit that were typically precipitated by behavioral abnormalities. As a result, our findings may not be generalizable to all clinical settings or to study populations recruited through other mechanisms.

In summary, our results support the nosologic distinction of the cognitive disorders included among the organic mental disorders described in DSM-III-R from the other major diagnostic groups of mental disorders that affect the elderly. However, they do not necessarily imply that biological factors have a smaller etiologic role in the development of the latter group of as yet idiopathic (cryptogenic) mental disorders. The survival of patients in this group was less than half that of patients with mood or psychotic disorders, even after con-

trol for differences in sociodemographic variables and medical burden. All three groups appeared to experience higher rates of mortality than did the general population, with standardized mortality ratios ranging from 1.5 to 2.5. For the most part, deaths occurred from the usual spectrum of natural causes in late life, with the exception that patients with mood disorders were more likely to have died from disorders of the digestive system and suicide than were the other two groups. Further studies of this population that systematically explore the sociodemographic and clinical correlates of survival within each major diagnostic group may advance our understanding of the clinical biology and treatment of the mental disorders of late life.

### REFERENCES

1. Kochanek KD, Hudson BL: Advance Report of Final Mortality Statistics: Monthly Vital Statistics Report. Washington, DC, US Department of Health and Human Services, 1992
2. Rowe JW: Health care of the elderly. N Engl J Med 1985; 312: 827–835
3. Rowe JW: The clinical impact of physiologic changes with aging, in Geriatric Psychiatry. Edited by Busse EW, Blazer DG. Washington, DC, American Psychiatric Press, 1989, pp 35–64
4. Schoenfeld DE, Malmrose LC, Blazer DG, Gold DT, Seeman TE: Self-rated health and mortality in the high-functioning elderly—a closer look at healthy individuals: MacArthur field study of successful aging. J Gerontol 1994; 49:M109–M115
5. Sluss TK, Gruenberg EM, Kramer M: The use of longitudinal studies in the investigation of risk factors for senile dementia-Alzheimer type, in Epidemiology of Dementia. Edited by Mortimer JA, Schuman LM. New York, Oxford University Press, 1981, pp 132–115
6. Gurland B, Cross P: The epidemiology of psychopathology in old age: some clinical implications. Psychiatr Clin North Am 1982; 5:11–26
7. Zubenko GS, Rosen J, Sweet RA, Mulsant BH, Rifai AH: Impact of psychiatric hospitalization on behavioral complications of Alzheimer's disease. Am J Psychiatry 1992; 149:1484–1491
8. Raskind MA: Organic mental disorders, in Geriatric Psychiatry. Edited by Busse EW, Blazer DG. Washington, DC, American Psychiatric Press, 1989, pp 313–368
9. Rabins PV: The impact of dementia on the family. JAMA 1982; 248:333–335
10. Myers JK, Weissman MM, Tischler GL, Holzer CE, Leaf PJ, Orvaschel H, Anthony JC, Boyd JH, Burke JD, Kramer M, Stoltzman R: Six-month prevalence of psychiatric disorders in three communities. Arch Gen Psychiatry 1984; 41:959–967
11. Blazer D, Williams CD: The epidemiology of dysphoria and depression in an elderly population. Am J Psychiatry 1980; 137: 439–444
12. Post F: The management and nature of depressive illness in late life: a follow-through study. Br J Psychiatry 1972; 293–304
13. Zubenko GS, Mulsant BH, Rifai AH, Sweet RA, Pasternak RE, Marino LJ Jr, Tu X-M: Impact of acute psychiatric inpatient treatment on major depression in late life and prediction of response. Am J Psychiatry 1994; 151:987–994
14. Post F: Affective psychoses, in Handbook of Studies on Psychiatry and Old Age. Edited by Kay DW, Burrows G. New York, Elsevier, 1984, pp 277–278
15. Alexopoulos GS, Young RC, Abrams RC, Meyers B, Shamoian CA: Chronicity and relapse in geriatric depression. Biol Psychiatry 1989; 26:551–564
16. Roth M: The natural history of mental disorder in old age. J Ment Sci 1955; 101:281–301
17. Kay DWK, Roth M, Hopkins B: Affective disorders arising in the serum, I: their association with organic cerebral degeneration. J Ment Sci 1955; 101:302–316
18. Kay DWK: Outcome and cause of death in mental disorders of

ses. Acta Psychiatr Scand 1962; 38:249–276

19. Robinson JR: The natural history of mental disorder in old age: a long-term study. Br J Psychiatry 1989; 154:783–789

20. Zubenko GS, Marino LJ, Sweet RA, Rifai AH, Mulsant BH, Pasternak RE: Medical comorbidity in elderly psychiatric inpatients. Biol Psychiatry 1997; 41:724–736

21. Rovner BW, Kafonek S, Filipp L, Lucas MJ, Folstein MF: Prevalence of mental illness in a community nursing home. Am J Psychiatry 1986; 143:1446–1449

22. Parmelee PA, Katz IR, Lawton MP: Depression among institutionalized aged: assessment and prevalence estimation. J Gerontol 1989; 44:M22–M29

23. Tariot PN, Podgorski CA, Blazina L, Leibovici A: Mental disorders in the nursing home: another perspective. Am J Psychiatry 1993; 150:1063–1069

24. Turnbull JM, Turnbull SK: Management of specific anxiety disorders in the elderly. Geriatrics 1985; 40:75–82

25. Kramer M, German PS, Anthony JC, Von Korff M, Skinner EA: Patterns of mental disorders among the elderly residents of eastern Baltimore. J Am Geriatr Soc 1985; 33:236–245

26. Weissman MM, Myers JK, Tischler GL, Holzer CE, Leaf PJ, Orvaschel H, Brody JA: Psychiatric disorders (DSM-III) and cognitive impairment among the elderly in the US urban community. Acta Psychiatr Scand 1985; 71:366–379

27. Allebeck P, Wistedt B: Mortality in schizophrenia: a ten-year follow-up based on the Stockholm County inpatient register. Arch Gen Psychiatry 1986; 43:650–653

28. Buda M, Tsuang MT, Fleming J: Causes of death in DSM-III schizophrenics and other psychotics (atypical group): a comparison with the general population. Arch Gen Psychiatry 1988; 45:283–285

29. Black DW, Winokur G: Age, mortality and chronic schizophrenia. Schizophr Res 1988; 1:267–272

30. Black DW, Fisher R: Mortality in DSM-III-R schizophrenia. Schizophr Res 1992; 7:109–116

31. Kay DWK: Schizophrenia and schizophrenia-like states in the elderly. Br J Psychiatry 1975; 9:18–24

32. Parkin D, Stengal E: Incidence of suicide attempts in an urban community. BMJ 1965; 2:133–138

33. Blazer D, George LK, Landerman R, Pennybacker M, Melville ML, Woodbury M, Menton KG, Jordan K, Locke B: Psychiatric disorders: a rural/urban comparison. Arch Gen Psychiatry 1985; 42:651–656

34. Blazer DG, Bachar JR, Manton KG: Suicide in late life: review and commentary. J Am Geriatr Soc 1986; 34:519–525

35. Mossey JM, Shapiro MA: Self-rated health: a predictor of mortality among the elderly. Am J Public Health 1982; 72:800–808

36. Kaplan GA, Camacho T: Perceived health and mortality: a nine-year follow-up on the human population laboratory cohort. Am J Epidemiol 1983; 117:292–304

37. Idler EL, Angel R: Self-rated health and mortality in the NHANES-I epidemiologic follow-up study. Am J Public Health 1990; 80:446–452

38. Wolinsky FD, Johnson RJ: Perceived health status and mortality among older men and women. J Gerontol Soc Sci 1992; 46:S304–S314

39. Overall JE, Gorham DR: The Brief Psychiatric Rating Scale. Psychol Rep 1962; 10:799–812

40. Hamilton M: A rating scale for depression. J Neurol Neurosurg Psychiatry 1960; 23:56–62

41. Mulsant BH, Sweet RA, Rifai AH, Pasternak RE, McEachran A, Zubenko GS: The use of the Hamilton Rating Scale for Depression in elderly patients with cognitive impairment and physical illness. Am J Geriatr Psychiatry 1994; 2:220–229

42. Folstein MF, Folstein SE, McHugh PR: "Mini-Mental State": a practical method for grading the cognitive state of patients for the clinician. J Psychiatr Res 1975; 12:189–198

43. Miller MD, Paradis CF, Houck PR, Mazumdar S, Stack JA, Rifai AH, Mulsant BH, Reynolds CF: Rating chronic medical illness burden in geropsychiatric practice and research: application of the cumulative illness rating scale. Psychiatry Res 1992; 41:237–248

44. Lacro JP, Jeste DV: Physical comorbidity and polypharmacy in older psychiatric patients. Biol Psychiatry 1994; 36:146–152

45. Graves EJ: National hospital discharge survey: annual summary. Vital Health Stat [13] 1993; 114:1–62

46. US Decennial Life Tables for 1979–81, vol 1, number 1, United States Life Tables. Washington, DC, US Department of Health and Human Services, 1985

47. van Dijk PTM, Dippel DWJ, Habbema JDF: Survival of patients with dementia. J Am Geriatr Soc 1991; 39:603–610

48. Varsamis MB, Zuchowski T, Maini KK: Survival rates and causes of death in geriatric psychiatric patients. Can Psychiatr Assoc J 1972; 17:17–22

49. Duckworth GS, Kedward HB, Bailey WF: Prognosis of mental illness in old age: a four year follow-up study. Can J Psychiatry 1979; 24:674–682

50. Schoenberg BS, Okazaki H, Kokmen E: Reduced survival in patients with dementia: a population study. Transactions of the Am Neurol Assoc 1981; 106:306–308

51. Molsa PK, Marttila RJ, Rinne UK: Mortality of patients with dementia. Acta Neurol Scand 1984; 69:230–231

52. Barclay LL, Zemcov A, Blass JP, Sansone J: Survival in Alzheimer's disease and vascular dementias. Neurology 1985; 35:834–840

53. Martin DC, Miller JK, Kapoor W, Arena VC, Boller F: A controlled study of survival with dementia. Arch Neurol 1987; 44:1122–1126

54. Liston EH: Delirium in the aged. Psychiatr Clin North Am 1982; 5:49–66

55. Rabins P, Folstein MF: Delirium and dementia: diagnostic criteria and fatality rates. Br J Psychiatry 1982; 140:149–153

56. Avery D, Winokur G: Mortality in depressed patients treated with electroconvulsive therapy and antidepressants. Arch Gen Psychiatry 1976; 33:1029–1037

57. Murphy E: The prognosis of depression in old age. Br J Psychiatry 1983; 142:111–119

58. Murphy E, Smith R, Lindesay J, Slattery J: Increased mortality in late life depression. Br J Psychiatry 1988; 152:347–353

59. Baldwin RC, Jolley DJ: The prognosis of depression in old age. Br J Psychiatry 1986; 149:574–583

60. Murphy JM, Monson RR, Olivier DC, Sobol AM, Leighton AH: Affective disorders and mortality. Arch Gen Psychiatry 1987; 44:473–480

61. Philbert RA, Richardo L, Lynch CF, Winokur G: Effect of ECT on mortality and clinical outcome in geriatric unipolar depression. J Clin Psychiatry 1995; 56:390–394

62. Feighner JP, Robins E, Guze SB, Woodruff RA Jr, Winokur G, Munoz R: Diagnostic criteria for use in psychiatric research. Arch Gen Psychiatry 1972; 26:57–63

63. Rovner BW, German PS, Brant LJ, Clark R, Burton L, Folstein MF: Depression and mortality in nursing homes. JAMA 1991; 265:993–996

64. Parmelee PA, Katz IR, Lawton MP: Depression and mortality among institutionalized aged. J Gerontol 1992; 47:3–10

65. Harris MJ, Jeste DV: Late-onset schizophrenia: an overview. Schizophr Bull 1988; 14:39–55

66. Esler M, Turbott J, Schwarz R, Leonard P, Bobik A, Skews H, Jackman G: The peripheral kinetics of norepinephrine in depressive illness. Arch Gen Psychiatry 1982; 39:285–300

67. Siever LJ, Davis KL: Overview: toward a dysregulation hypothesis of depression. Am J Psychiatry 1985; 142:1017–1031

68. Roy A, Pickar D, De Jong J, Karoum F, Linnoila M: Norepinephrine and its metabolites in cerebrospinal fluid, plasma, and urine. Arch Gen Psychiatry 1988; 45:849–857

69. Rifai AH, Mulsant BH, Sweet RA, Pasternak RE, Rosen J, Zubenko GS: A study of elderly suicide attempters admitted to an inpatients psychiatric unit. Am J Geriatr Psychiatry 1993; 1:126–135

70. Blueprints on Aging, A Strategic Plan on Aging commissioned by the Commissioners of Allegheny County, Commonwealth of Pennsylvania. Pittsburgh, Commissioners' Office, Allegheny County, September 1986, pp 1–IV-61

71. Aging Scan Committee: Aging Environmental Scan. Pittsburgh, Jewish Healthcare Foundation, United Way of Allegheny County, and Southwestern Pennsylvanian Partnership for Aging, 1996, pp 1–48

**Curriculum Vitae**

# Kenneth Scott Duckworth, M.D.
Ken@nami.org

**Personal Data**

| | |
|---|---|
| Home Address: | 831 South Street |
| | Roslindale, MA 02131 |
| | |
| Work Address: | Medical Director |
| | Vinfen Corporation |
| | 950 Cambridge Street |
| | Cambridge, MA 02141 |
| Telephone: | 617/441-1750 |

**Education**

| | | |
|---|---|---|
| 1981 | B.A. | University of Michigan |
| 1986 | M.D. | Temple University School of Medicine |

**Postdoctoral Training**

| | |
|---|---|
| 1986-1987 | Transitional Internship, Lemuel Shattuck Hospital, Tufts Medical School |
| 1987-1990 | Resident in Psychiatry, Massachusetts Mental Health Center |
| 1989-1990 | Co-Chief Resident, Program in Psychiatry and the Law Massachusetts Mental Health Center |
| 1989-1991 | Child and Adolescent Psychiatry Fellow Massachusetts Mental Health Center |

**Licensure and Certification**

| | |
|---|---|
| 1986 | Diplomate, National Board of Medical Examiners |
| 1987 | Massachusetts License Registration |
| 1991 | Diplomate, American Board of Psychiatry and Neurology in Adult Psychiatry |
| 1992 | Diplomate, American Board of Psychiatry and Neurology in Child and Adolescent Psychiatry |
| 1994 | Diplomate, American Board of Psychiatry and Neurology in Forensic Psychiatry |

**Academic Appointments**

| | |
|---|---|
| 1987-1991 | Clinical Fellow, Harvard Medical School |
| 1991-1998 | Instructor in Psychiatry, Harvard Medical School |
| 1999- | Assistant Professor of Psychiatry, Harvard Medical School |

**Hospital Appointments**

| | |
|---|---|
| 1991-1992 | Staff Psychiatrist, Adult Outpatient Department |
| | Massachusetts Mental Health Center |
| 1992-1993 | Interim Training Director |
| | Child and Adolescent Psychiatry Fellowship |
| | Massachusetts Mental Health Center |
| 1993 -1998 | Medical Director, Continuing Care Outpatient Service |
| | Massachusetts Mental Health Center |
| 1998 -2000 | Clinical Director, Massachusetts Mental Health Center |

**Other Professional Positions**

| | |
|---|---|
| 1988-1989 | Consultant, Quincy Court Clinic |
| 1988-1989 | Consultant, Family Alcoholism Program |
| | Southern Jamaica Plain Health Center |
| 1989- | Private Practice |
| 1989-2005 | Consultant, Fessenden School, Newton, MA |
| 1990-1991 | Consultant, Dana Farber Cancer Institute |
| 2004- | Clinical Advisory Council, Human Services Research Institute, Cambridge, MA |
| 2004- | Consultant, Boston Medical Center ACCESS Project |
| 2005- | Member, National Coordinating Council, Standards for Bipolar Excellence (STABLE) Project |
| 2005- | Board Member, Kyle's Treehouse for Autism Awareness |
| 2006- | Member, Steering Committee, NIMH Bipolar Disorder Trials Network |
| 2006- | Member, Psychopharmacology Workgroup, Massachusetts Department of Mental Health |
| 2006- | Member, Advisory Board, National Resource Center for Psychiatric Advance Directives (NRC-PAD) |
| 2006- | Consultant, Mental Health Transformation State Incentive Grants Evaluation Work Group |

**Clinical Administrative Responsibilities**

| | |
|---|---|
| 1991-1992 | Staff Psychiatrist, Adult Outpatient Department |
| | Massachusetts Mental Health Center |
| | Led a team of PGY-lll residents, psychology interns, and social work students on patient interviewing, evaluation and treatment |
| 1992-1993 | Interim Training Director, Massachusetts Mental Health Center |
| | Child and Adolescent Psychiatry Fellowship |
| | Coordinated training for four child psychiatry Fellows. |

1993- 1998    Medical Director, Continuing Care Outpatient Service
              Massachusetts Mental Health Center
              Overall responsibility for ensuring quality care for 1000 outpatients with
              serious and persistent mental illness; supervision of 12 psychiatrists, 15
              psychiatry residents, and 7 psychology interns who worked with this
              population; interpretation and development of policies; carried clinical
              caseload; developed/directed "Homeless Rotation" for residents.

1998 - 2000   Clinical Director, Massachusetts Mental Health Center
              As above with addition of the Day Hospital

**Major Clinical Administrative Responsibilities**

2000 - 2003   Deputy Commissioner, Clinical & Professional Services
              Massachusetts Department of Mental Health
              Chief Psychiatrist for a service system that has 25,000 patients
              and 4,500 employees.  Reported directly to the Commissioner.
              Developed/interpreted regulations, policies.
              Final clinical authority for the Department of Mental Health.
              Clinical liaison with Division of Medical Assistance and Department of
              Public Health.
              Supervised licensing of all inpatient psychiatric facilities.
              Development of initiatives with public and private entities.
              Spokesperson to the media on matters of clinical relevance.
              Clinical authority on patient-related decisions.
              Supervised research and training contracts.
              Conducted case conferences throughout the system.
              Oversaw closure of Medfield State Hospital with placement of patients
              in a variety of community settings, including supported housing and
              Assertive Community Treatment.

2003          Acting Commissioner, Massachusetts Department of Mental Health
              Leadership and executive decision-maker for $600 million agency.
              Active in EOHHS Human Service Reorganization.
              Policy, budget, personnel decision making.

2003-         Medical Director, National Alliance on Mental Illness, Arlington, VA
              Sole M.D. resource to 220,000 members and 1,100 affiliates.
              Policy, advocacy, media, research and science translation to public
              audience.  NAMI is the largest consumer, as well as the largest family
              member, organization for people with mental illness in the United States.

2003 - 2005   Westbridge Community Services, Cambridge, MA
              Psychiatrist to dually diagnosed individuals on private PACT team.

2005 -      Medical Director, Vinfen Corporation, Cambridge, MA
            Oversee clinical care of 3,000 adults and children with mental illness,
            mental retardation, and behavioral health disabilities in supported
            housing, group residential, respite, day, educational, clinical,
            rehabilitative and crisis intervention programs and services in
            eastern Massachusetts and northern Connecticut.

**Professional Society Involvement**
1990 -      American Psychiatric Association
2003 -      New England Council of Child and Adolescent Psychiatry
2004 -      Board Member, American Association of Community Psychiatrists

**Awards and Honors**
1981        High Honors, University of Michigan

1986        AOA, Honor Medical Society, Temple Medical School

            O. Spurgeon English Award, Outstanding Student in Psychiatry,
            Class of 1986, Temple Medical School

            Alpers Society Award for Excellence in Neurology,
            Temple Medical School

1991        Second Prize, NECAAP Research Competition

1995        Association for Academic Psychiatry Junior Faculty
            Award for Excellence in Teaching

1997        Exemplary Psychiatrist Award
            National Alliance on Mental Illness

            Distinguished Service Award
            Massachusetts Department of Mental Health.

            Finalist, AMA International Health Medical Film Competition.

            Clinician of the Year,
            Massachusetts Alliance for the Mentally Ill

1998        Nancy C. A. Roeske, M.D., Certificate of Recognition for Excellence in
            Medical Student Education, American Psychiatric Association

1999        Rona and Ken Purdy Award
            National Alliance for the Mentally Ill

            Outstanding Psychiatrist Award for Clinical Psychiatry
            Massachusetts Psychiatric Society

| 2003 | Irwin Celebration Recovery Award, NAMI Massachusetts |
| 2004 | Boston University School of Public Health Excellence in Teaching |
| 2005 | Distinguished Fellow, American Psychiatric Association |
| 2006 | Boston University School of Public Health Excellence in Teaching |

## Bibliography
Original Articles

1.  Gutheil TG, Duckworth K.  The psychiatrist as informed consent technician: a problem for the professions.  Bulletin of the Menninger Clinic 1992; 56:87-94.

2.  Duckworth K, Kahn MW, Gutheil TG.  Roles, quandaries, and remedies: teaching professional boundaries to medical students.  Harvard Review of Psychiatry 1994; 1:266-270.

3.  Duckworth K, Kingsbury SJ, Kass N, Goisman R, Wellington C, Etheridge.  Voting behavior and attitudes of chronic mentally ill outpatients.  Hospital and Community Psychiatry 1994; 45:608-609.

4.  Duckworth K, Nair V, Patel JK, Goldfinger SM.  Lost time, found hope and sorrow: The search for self, connection and purpose during "awakenings" on the new antipsychotics.  Harvard Review of Psychiatry 1997; 5:227-233.

5.  Nair V, Duckworth K, Patel J.  The newer antipsychotic agents: Reassessing the therapeutic context for psychosocial rehabilitation interventions.  ASEAN Journal of Psychiatry 1997; 5:1-11.

6.  Kahn MW, Duckworth K.  Needing treatment, wanting nothing: Ethical dilemmas in the treatment of the homeless mentally ill.  Harvard Review of Psychiatry 1998; 5:274-280.

7.  Reilly EC, Ashe BL, Duckworth K.  Tailoring and individualizing housing programs for homeless persons with chronic mental illness.  Harvard Review of Psychiatry 1999; 6:166-171.

8.  Barreira P, Duckworth K, Goff D, Flannery RB.  Clinical practice guidelines: The Massachusetts experience.  Harvard Review of Psychiatry 1999; 7:230-232.

9.  Duckworth K, Hanson A.  Managed Care: Using a clinical and evidence-based strategy to preserve access to psychiatric medications.  Psychiatric Services 2002; 53:1237-1238.

10.  Bachman S, Duckworth K.  Consensus building for the development of service infrastructure for people with dual diagnosis.  Administration and Policy in Mental Health 2003; 30:255-266.

11.  Duckworth K, Halpern J, Schutt R, Gillespie C.  Use of schizophrenia as a metaphor in U.S. newspapers.  Psychiatric Services 2003; 54:1402-1404.

12. Lebel J, Stromberg N, Duckworth K, Kerzner J, Goldstein R, Weeks M, Laflair L, Sudders ML. Child and adolescent inpatient restraint reduction: A State initiative to promote strength-based care. Journal of the American Academy of Child and Adolescent Psychiatry 2004; 43:37-45.

13. Goff D, Evins AE, Henderson D, Freudenrich O, Copeland P, Bierer M, Duckworth K, Sacks F. Medical morbidity and mortality in schizophrenia: Guidelines for psychiatrists. The Journal of Clinical Psychiatry 2005; 2.


**Clinical Communications**

1. Clinical Practice Guidelines for the Treatment of Schizophrenia in Adults. Executive Office of Health and Human Services, Commonwealth of Massachusetts, 1999. Co-Chair, Design Committee. Commissioned by the Massachusetts Department of Mental Health

2. Principles for the Treatment of Co-Occurring Psychiatric and Substance Abuse Disorders for Persons with Serious Mental Illness. Executive Office of Health and Human Services, Commonwealth of Massachusetts, 2001. Co-Chair, Design Committee. Commissioned by the Massachusetts Department of Mental Health.

3. Clinical Practice Guidelines for the Treatment of Bipolar Illness. Executive Office of Health and Human Services, Commonwealth of Massachusetts, 2002. Member, Design Committee. Commissioned by the Massachusetts Department of Mental Health.

4. Mortality Report 2000. Executive Office of Health and Human Services, Commonwealth of Massachusetts, Department of Mental Health, 2002. Lead author.


**Educationally Relevant Publications**

1. Shouten R, Duckworth K. Medicolegal and ethical issues in the pharmacologic treatment of children. In: Werry J and Amari M, editors. Practitioner's guide to psychoactive drugs. New York: Plenum Publishing, 1993:161-178.

2. Woodward B, Duckworth K, Gutheil TG. The pharmacologist-therapist collaboration. The APA Annual Review of Psychiatry, 1993:631-649.

3. Goldfinger SM, Duckworth K. Module in Psychiatry, National Public Health Service Curriculum (with The American Medical Student Association), 1993

4. Duckworth K, Gutheil TG. Liability potential for psychiatrists who supervise the care given by other mental health professionals. In: Flach F, editor. Psychiatric malpractice risk management. New York: The Hatherleigh Company, Ltd; 1994: 62-69.

5. Duckworth K, et al. Ethics and interface with the legal system. In: Tasman A, Kay J, Lieberman J, editors. Psychiatry. Philadelphia: WB Saunders Company, 2003.

6.    Duckworth K.  Curriculum: "The stigma of mental illness," 1997. Video component produced by Jane Bassik, Dartmouth-Hitchcock Medical Center, New Hampshire.

7.    Duckworth K, Borus J.  Population-based psychiatry in the public sector and managed care.  In: Nicholi A, ed.  The New Harvard Guide to Psychiatry (3rd ed).  Cambridge, MA: Harvard Press, 1999: 778-797.

8.    Duckworth K, Gruttadaro D.  A family guide to adolescent depression.  NAMI Publication, May 2005.

9.    Honberg R, Duckworth K, et al.  NAMI grades the states.  NAMI, March 2006.

10.   Halpern L, Duckworth K.  Peer and Consumer Involvement.  In: Glick RL, Berlin JS, Fishkind A, Zeller S, eds.  Emergency Psychiatry: Practices and Principles.  Philadelphia: Lippincott Williams & Wilkins (in process).

# vinfen
*helping to transform lives*

## FAX TRANSMISSION COVER SHEET

| DATE: | 7-2-08 |
|---|---|

| | TO: Kelly Shuler | | FROM: |
|---|---|---|---|
| (name) | K | (name of sender) | Lori Willis |
| (fax number) | (202) 785-3719 | (phone number) | (612) 441-1760 |

You should receive _17_ pages, including this cover sheet. If you do not receive all the pages, please call the sender above.

> Hi Kelly: Here is the Expert Report from Ken.
> Please Review.    Thanks. Lori Willis

☐ Check if Protected Health Information is Attached

Confidential Health Information Enclosed. It is being sent to you after appropriate authorization from the person served and/or guardian, or under circumstances that do not require authorization. You are receiving an obligation to maintain secure, and confidential manner. Re-disclosure without additional person served authorization or as permitted by law is prohibited. Unauthorized use or re-disclosure, or failure to maintain confidentiality could subject you to civil and criminal penalties described in federal and state law. IMPORTANT WARNING: This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, use, or copying of this information is STRICTLY PROHIBITED. If you have received this fax by error, please notify sender immediately and destroy or return the information.

EFFECTIVE DATE: 4/14/03    REVISION DATE: 8/1/2004

Expert Report -- Kenneth Duckworth, M.D.

(Roberson) Alan Martin v. the District of Columbia

July 3, 2008

In my professional opinion, the Saint Elizabeth's Hospital was grossly negligent in the care of Dr. Alan Martin and Mr. William Dunbar, Dr. Martin's assailant. This negligence directly resulted in the unnecessary and preventable homicide of Dr. Alan Martin by Mr. William Dunbar.

In reaching this opinion, I conducted a thorough review of the following records provided to me by Attorney Kelly Fisher:

1.    St. Elizabeth's Hospital ("SEH") records for Alan Martin from 3/31/04-4/4/04

2.    The following SEH records for William Dunbar:

    Comprehensive Psychiatric Emergency Program ("CPEP") Evaluation 6/18/03
    Progress notes 3/30-4/08/04
    Medication records 3/31-4/04/04
    Admission Documents/Initial Evaluations 3/31-4/4/04
    Physical Examination 3/30/04
    Pretrial Psychological examination 9/21/05 performed by Dr. Sweda
    Sample Observations Flow sheet Post incident
    Bolten Report 4/4/06

3.    DC Investigative Documents relevant to the incident
    MPD Documents
    Time sheets/Staffing assignments

4.    Policies, Procedure and Administrative documents from SEH provided to me

5.    Reports on SEH
    A. Fields and Associates (Consultant's report on SEH systems of care)
    B. SEH Plan of correction in response to Fields and Associates report
    C. Dixon Report
    D. Patients in Peril University Legal Services report
    E. Report to court by Dennis Jones
    F. Department of Justice Report
    G. Department of Mental Health Restructuring Initiative for FY 2003.

The fatal patient-on-patient violence that killed Dr. Martin occurred in the context of a pattern of staffing crises, substandard staff training, poor staff supervision,

lack of administrative oversight, and inadequate quality assurance programming. SEH's clinical negligence on several levels in the assessment and care of Mr. Dunbar and ill-advised choices in the care of Dr. Martin directly caused the death of Mr. Martin.

## I.      Clinical reports related to the fatal assault

The clinical reports related to the fatal assault are as follows:

RN note dated 4/4/04:

"On 4/4/04 Mr. Martin was assaulted about 6:40 am by Mr. William Dunbar according to several eyewitnesses.  Pt was approached by him the dayroom by about 645 am by Pt #261327 who punched Mr. Martin in the head and he fell down, started stamping him on the R (right) side of his face and head as per report by staff who witnessed the incident from the beginning.  When writer arrived the scene she witnessed Pt # 261327 continuously stamping on Mr. Martins head. Staff tried to stop but failed Pt #26137 turned angrily to staff meanwhile nursing office was notified code 13 was called followed by a code Blue as pt bled profusely and turned blue, unconscious, security was called, VS checked --BP 78/49, p 48, r and t could not be ascertained, Pt suctioned IV and O3 commenced 911 called. Pt was finally taken via ambulance to ER.

The night MD note reads "Called to respond to medical emergency at 640 am on arrival I found Mr. Martin on floor moaning, groaning bp 79/45-48."

## II.      Assailant William Dunbar - Inadequate Assessment, Failure to Perform a Mental Status Exam, Inadequate Treatment Planning, Risks During Course of Hospitalization Unheeded, and Inappropriate Safety Placement by SEH Intake Assessment—SEH's Failure to Integrate its Extensive Historical Knowledge of Mr. Dunbar's Risk of Violence

Mr. Dunbar was well-known to SEH to present with a high violence risk, especially when untreated and paranoid.  A summary of his four (4) prior SEH hospitalizations is below:

1)      Mr. Dunbar first was admitted to SEH in December, 2000 for five days for "psychotic disorder NOS, PCP abuse and cannabis dependence; he demonstrated homicidal ideation and tried to seek out a female friend and stab her." (Sweda Report, p. 17)

2)      Mr. Dunbar was re-admitted from March 27 to April 18, 2003, approximately one year prior to his assault on Dr. Martin, for "attacking his mother with a knife and choking her in the context of medication noncompliance. He had been sleeping with knives under his bed. ..The assessment was "acute

2

psychosis with paranoid delusions and aggressive and violent behavior." (Sweda Report, p. 18)

       3)      Mr. Dunbar was re-admitted to SEH from June 19 - August 11, 2003 according to one CPEP note (dated 6/18/03) for "cutting his brother with a knife" in the context of "paranoid delusions." He refused medications, and cheeked others. (Sweda Report, p. 19) The note goes on to say that he denies the above and is very guarded. "Exhibits poor insight and judgment." On the 6/18/03 CPEP note, Dr. Anil Hinnaria writes that "he has decompensated 2 [secondary] to noncompliance and is a danger to others and requires hospitalization for stabilization."

       4)      Mr. Dunbar was re-admitted to SEH from October 29, 2003 - December 18, 2003 for assaulting two (2) people in the street for "no reason or provocation." (Sweda Report, p. 19). Again he was non-compliant with his medications. He attacked strangers without provocation per eyewitness his nephew. "He has psychotic symptoms...and was carrying knife all the time." (Sweda Report, p 19).

Based on these four prior hospitalizations, William Dunbar demonstrated a consistent and clear pattern of unpredictable violence and non-compliance with antipsychotic medication that was demonstrably well-known to SEH.

During the March 31/2004 admission he was clearly in a very high risk state-- toxicology positive for cannabis, paranoid, agitated, labile, uncooperative, clearly off medications, and threatening to his case manager and repeatedly assaultive and threatening to his family.

Incredibly, none of this extensive prior knowledge of his risk was integrated in SEH's assessment, treatment, or medication management of Mr. Dunbar during his 3/31/04-4/4/04 admission. The intake assessment of 3/31/04 notes under "violent and/criminal behavior," "None per record." It is unknowable which SEH record could have produced this exactly wrong notation., both in terms of violence or his prior criminal Assault charge. Clearly, the prior hospitalizations at SEH and CPEP notes done prior to the admission were not reviewed by Dr Shah or her supervisor. There is no mention of prior admissions or of the prior or immediately relevant CPEP notes, which is a clear departure from the standard of care for this high-risk man.

SEH's failure to contact the Dunbar family shortly after his admission is similarly negligent, given the extent of knowledge and experience that the family had of his unpredictable violence, non-compliance with medication, substance abuse, and potential triggers for violent episodes.

**B.    Inadequate Intake Assessment – SEH's Failure to Perform a Mental Status Exam on Mr. Dunbar**

The Mental Status Exam ("MSE") is a key aspect of psychiatric care and essential

to apply to all new admissions on an acute Psychiatric unit in particular.

A complete clinical Mental Status exam might have put Mr. Dunbar's risk of violence into more context. However, significantly, and alarmingly, he was too agitated and uncooperative to complete the MSE conducted by SEH's Dr. Saeeda Shah, and co-signed by what appears to be Dr. Marguez (sp) As a result, massive areas in the mental status exam were left blank, including these sections:
- thought processes
- impulse control (ability to control aggressive/ hostile /sexual impulses)
- homicidal ideation
- thought content
- perception hallucinations
- command hallucinations
- suicide level
- energy level
- cognitive
- insight
- judgment

Moreover, the information that was noted on admission was quite alarming. The following boxes were checked: "tense," "uncooperative," "irritable," and "labile." Significantly, even this grossly inadequate psychiatric assessment did note that he has "long h/o [history of] mental illness and non-compliance." On the Intake Assessment form, under "Danger to Others," the note is checked "yes" - he was threatening to people in the building." Each of these elements should have raised the doctor's concern. Additionally, the intake assessment also ignores the categories of "issues of urgency" and "special precautions."

Lack of intake data coupled with incomplete but very high risk data require a conservative stance in handling the patient and demand a more aggressive search for answers. Dr. Shah her supervisor, and her clinical teammates failed to do either.

When a high risk patient, such as Mr. Dunbar, is too agitated and uncooperative to complete a mental status exam, reasonable care requires more caution, not less caution. Rather than considering potential interventions given his propensity for violence and his unpredictability (as noted in the Sweda report by a witness to the event), SEH simply added Mr. Dunbar to a woefully understaffed and overcrowded unit. Issues of staffing and overcrowding during the day sin question will be discussed later in this report.

## C.    Inadequate Treatment Planning for Mr. Dunbar

There was only high risk data, grossly incomplete data, (absence of history at SEH and MSE) and erroneous data in his incomplete intake evaluation. The absence of competent information or a sensibly conservative approach is reflected in his problem list that does not reflect a concern about safety for third parties.

4

Rather, his active problems are described as :
1.      hallucinations (per Fd-12 patient was talking to himself)
2.      non-compliance
3.      poor impulse control.

The only treatment plan interventions that are listed for these active problems are to offer medications and psychotherapy. Notably, Mr. Dunbar received none of either modality prior to the assault. There is no consideration of the standard of care menu of potential interventions for extremely high risk individuals.

Even a treatment team that missed the history of recurrent violence in the face of non compliance could have taken the 3 problems noted above--all of which were accurate---and made conservative interventions part of the plan. Again this did not occur.

The unexamined SEH history also shows that Mr. Dunbar does very well on antipsychotic medications and has no violence when properly treated. His ex-girlfriend notes that he worked and was not violent when on medications, and in fact she broke up with him when he stopped taking his medications. Dr. Sweda also notes he is cooperative and "non violent" or paranoid when fully medicated (Sweda report pp 11, 35). This is very relevant as there is one variable-- taking antipsychotic medications--that takes his risk from very high to very low. Belatedly, the staff does in fact go to medicate him involuntarily 11 days after the assault, and then he starts to take his antipsychotics orally with the predictable result that "he began to stabilize after taking his medication." (Sweda p 25).

The admission negligence, pro forma and non- individualized care plan and lack of recognition of the level of risk for this man who was known to be quite ill and refusing medications continues until he is assaultive. There were no elements in his history or presentation that indicated that his risk of harm to others was anything other than extremely high. Erroneous information concerning his history of violence, coupled with ignored real information and unknown information from the MSE, led to a failure to identify appropriate level of risk and thoughtful interventions to address that risk.

     Despite the fact that Mr. Dunbar's incomplete and inadequate SEH intake notes contain many warning signs for violence, SEH fails to recommend any of the following potential interventions, all of which are within the standard of care for a person known to be of high-risk of violence:

     1)      1:1 coverage (one staff member assigned to monitor Mr. Dunbar exclusively);
     2)      A Day room restriction for him (which would have provided heightened visual monitoring by the staff nurses);
     3)      Assessing the need for involuntary medication administration;
     4)      Using his family to help convince him of the need for medications and to understand his triggers for violence;

6)    Identifying antecedents/triggers to violence;
7)    Application of a safety/behavioral plan; and
8)    Requesting neuropsychological testing to assess Mr. Dunbar's cognitive capacity.
9)    Consideration of a more intensely staffed facility or unit

These stark treatment planning omissions are clearly consistent with deviation from a reasonable standard of care.

**D.    Risks Identified by SEH and Not Addressed during Mr. Dunbar's Admission**

The intake process was erroneous, incomplete, and lacked the basics of a mental status evaluation and thoughtful intervention plan. Yet, while a patient is in a hospital, opportunities exist to correct earlier mistakes. Contacting family, getting a consult from an expert, interdisciplinary team discussions, interviewing past providers who have cared for a patient who has been in the same facility, can make an apparently cloudy picture clearer. These opportunities were missed by SEH as well.

While the admitting doctors grossly underestimated Mr. Dunbar's risk, there is data that demonstrates other members of the clinical team saw more risk, yet none of this is incorporated into the care plan. A note from the psychiatry (night duty) doctor reads a follows: "He threatened his case manager when they intervened" demonstrating SEH's knowledge of violent threats to non -family members. Similarly, the RN admission note reads Mr. Dunbar is "a 24 year old man being readmitted after he has been threatening others, and pulled a knife on his mother and sister". (Dunbar progress notes)

According to SEH's notes concerning observation of Mr. Dunbar during his March 31-April 4, 2004 admission the following are relevant:

3/31 a partial note reads "He is uncooperative and threatening. Admission orders written. Observation." V. Audrocess (sp)
3/31 "He remembered writer from FD12 /social worker"
3/31 "Pt very psychiatrically uncooperative and threatening. With above s/s/ and w his hx of violent . non compliant beh (illegible)"
3//31 "Patient has been pacing around....refused his pm medications."
4/1  "Remains uncooperative Audross (Sp)"
4/1 "He was counseled to and encouraged to comply with his medication regimen but he has no insight. .... Mood easily irritable and affect is labile"
4/2/ 04 "Non compliant with medications"
4/2/04 report that he assaulted staff in the hospital on prior admission (signature illegible)

6

4/2/04 "Very defensive ....a long history of violent behavior...constantly threatening family...was said to have assaulted his (illegible) December with a shovel, cut his uncle's wrist with a knife. Assaulted a staff in the hospital. Refuses medications and will not follow treatment plan. Was threatening his family before this hospitalization. Patient poses a very grave danger to family in the community. (illegible)
4/3 notation of refusal of medication
4/4 Assault note of Mr. Martin

The SEH Staff has made many errors in the assessment and treatment planning for Mr. Dunbar. Here is it also clear they missed many warning signs along the way in his hospital course at the unit as well. Dr Teter's review specifically notes that the multi-party discussion on 4/2 did not include "any discussion of dangerousness." (Teter notation #3.)

### E.  Dr. Alan Martin and William Dunbar - Inadequate Safety Placement by SEH

Dr. Martin had far fewer risk factors for harm to others than Mr. Dunbar yet, incredibly, it is Dr. Martin who is placed on day room restriction, not Mr. Dunbar. The LOCUS (Level of Care Utilization System) score compiled by CPEP for Dr. Martin is 26; Mr. Dunbar's score was 28—30 is the maximum score. Mr. Martin is older (age 56) which lowers his risk of violence compared to Mr. Dunbar, who is more than 30 years younger. Additionally, Dr. Martin is willing to take medications which again lowers his risk compared to Mr. Dunbar. Dr Martin is described as cooperative, Mr Dunbar is agitated and uncooperative. Dr. Martin had no criminal arrest record, whereas Mr. Dunbar had an assault charge in Fairfax Virginia undetected by the assessment. Mr. Martin weighed 118 lbs and is 5 foot 8. (Teter report DC exhibit 168) Mr. Dunbar is 200 pounds and is six feet tall (DC exhibit 117). SEH's decision to place the more vulnerable and less violent Dr. Martin on Day room restriction reduced Dr. Martin's ability to flee while increasing the mobility potential for Mr. Dunbar, a much higher risk individual.

Dr. Teter notes that Dr Martin "was on day room restriction for assaultive behavior. He was cooperative, was never assaultive, suicidal or homicidal. " (DC Exhibit 170 page 4 Teter review of Mr. Martin).

Simply stated, it is hard to imagine any reasonably competent psychiatric service putting Dr. Martin at a higher level of risk for harm to third parties than Mr. Dunbar yet this is the exact outcome of the SEH admission and care process for these two men. These

### III. Retrospective reviews by SEH

### A. Summary of Dr. Sweda's Psychological Pre trial Report on Mr. Dunbar

A review of Dr Sweda's report of Mr. Dunbar--all done after the assault-- finally puts his clinical picture together.

"The primary symptom pattern that must be accounted for is in this individual is a history of psychotic symptoms in late 2000 which have continued up to the present date, though symptoms have been controlled with psychiatric medications and treatment in a structured environment. From the earliest onset of his symptoms, his illness has been tied to violent behavior. In December 2000, he was described as being paranoid, grandiose, and he tried to stab a female friend while in a psychotic state. In 2003, he was talking to himself and observed to be laughing inappropriately. While psychotic he attempted to stab his mother, choke his mother, and also attacked his teenage brother whom he thought was his son. His symptoms of paranoia, apparent auditory hallucinations, and delusional ideation combined with inappropriate affect and impairment in psychosocial functioning qualify him for a diagnosis of schizophrenia, Paranoid type. (Sweda Report, P. 29)

Dr. Sweda further observes that Mr. Dunbar was assessed as posing a "very grave danger to others due to his mental illness two days prior to the instant offense." (Sweda Report, P.9). He concludes, "It is my opinion that the patient was acutely psychotic, paranoid, and in minimal control of his impulses at the time of the offense. He was unmedicated at the time of the offense. There has been a clear link to his mental disorder and violent behavior before during and after the instant offense.. It should also be noted that he had a positive toxicology screen for cannabis while hospitalized. Cannabis is an unlikely cause of the violence or disordered perceptions that the patient exhibited days before and weeks after the offense. During his present hospitalization, the patient became irritable and assaultive during periods when he was suspected to be not taking his medications. When he is fully medicated, he has been calm, cooperative, and not at all paranoid and violence." (Sweda Report, p. 34)

The first detailed understanding from Mr. Dunbar's mother's perspective is in the record is after the fact of the assault on June 1 by Dr Sweda. Dr Sweda learned that his mother Catherine Dunbar believes "He becomes violent for no apparent rational reason." (p 9) She stated William "went after my son Arthur. He choked him and stole his money" William also "came at me, during the same incident. I was trying to get Arthur away from him. He choked me and pulled my hair out." William was also violent towards Mrs. Dunbar's son Terry. She stated, "William was sitting on the porch with Terry. Terry asked for a cigarette and William gave him a cigarette. William then "turned on him (Terry) and stabbed him." William later expressed the delusional belief that Terry had a gun at the time of the stabbing." (Sweda Report, p10)

Dr Sweda also learned from his former girlfriend his history of violence to her, more about his paranoia, medication non compliance and use of marijuana and PCP.

None of this important collateral information regarding his violence is anywhere in the

8

clinical record.

According to the Sweda Report, on April 2, 2004, SEH notes indicated that Mr. Dunbar was refusing medications and was seen as being defensive with "no insight in the gravity of his threatening behavior, and notes he posed an extreme risk of harm, had serious impairment of his functional status. (p 21)

Dr. Sweda's report details another episode of violence with William "attacking strangers with a shovel" and still another March 31, 2004 "threatened me with a knife".  (Sweda Report, 10).

Dr,. Sweda concludes that Mr. Dunbar, due to the severity of his symptoms, meets the legal criteria for  insanity.

## B. Post-Death Review Conducted by Dr. Lenore Teter

Dr. Lenore Teter, appointed the  Director of Psychiatric Services after the assault, conducted a review six months after the fatal  incident 11/10/04, noted many other areas that were ignored or unattended to in the care of Mr. Dunbar.  They include:

1.      LOCUS score from CPEP score 28/30 including "Extremely high risk of harm, support in the community, poor response to treatment and recovery, and unengaged.
2.      Escalated pattern of violence per CPEP.
3.      The patient was noted to be agitated with poor impulse control, with a pronounced risk of violence requiring intensive management."
4.      The patient received Geodon 20mg IM and Ativan 2mg IM on March 30, 2004, at 13:00 hour for his level of violence and resistance to treatment.
5.      MSE (checklist) includes mood was irritable...thought content paranoid. Poor insight and judgment...He was responding to voices.

She writes the following conclusions of the care of Mr. Dunbar (I have included here the most relevant for purposes of this report):

1.      Mr. Dunbar was admitted to SEH on March 30, 2004 because of violent threats with a background of past violent acts and incarceration for violence.
2.      CPEP notes about this patient's violent behavior and the progress notes form the case manager on April 2, 2004 about the patient's dangerousness to the family were clearly documented.
3.      On Friday April 2, Dr. Marquez, unit Psychiatrist, Dr. Ohouha, Outpatient Psychiatrist from Assertive Community Treatment team 4 and Mr. Woodland RN, Unit Coordinator met with Mr. Dunbar but did not mention any discussion of dangerousness with the patient in the progress note, especially the dangerousness to his family.
4.      Patients with a history of violence are likely to repeat their violent behaviors

which he did.

She made the following recommendations:

(1)    Establish a mechanism to enhance verbal communication between CPEP psychiatrist, and unit psychiatrist, in the event a patient has been assaultive at CPEP.
(2)    Assaultive patients are placed on one to one special for the first 24 hours of admissions to asses their mental status/risk of assault on the psychiatric unit.
(3)    Families of assaultive patients should be contacted immediately for their history about the patient's violent behavior and family meeting scheduled within 24 hours of the person's admission, to discuss their concerns about the patient and allow the patient to communicate heir needs.
 (4)    Treatment planning should be scheduled within 24 hours of the patients' admission due to severity of the patients' violent symptoms.
(5)    Review procedure for charting psychiatric assessment and progress notes with psychiatrists, general medical officers, externs, medical students, and nursing staff.
(6)    In depth review of policies and procedures dealing with violent behaviors with all staff including additional training.
(7)    Debriefing and corrective action to be taken with professional staff of Ward 4 by their discipline chiefs to prevent any further major incidents of violence."

In my opinion, Dr Teter has articulated many core elements of adequate care that were clearly missing from the care of Mr. Dunbar. These are examples of the kind of steps that need to be taken to provide a safe environment on an admission unit with high risk individuals. None of these reasonable care standards were in place for Mr. Dunbar and Dr. Martin during their 2004 treatment at SEH, and, based on the information that follows below, it is not clear that any of them are in place at this time.


## IV. Grossly Inadequate Staffing, Overcrowding, and Dearth of Quality Management Processes at the Time of the Assault

Inadequate level and training of staff has been a chronic issue to SEH before, during, and after the assault. SEH has done virtually nothing to remedy this safety crisis and has done virtually nothing to develop a competent quality improvement program to understand the underlying cause of these staffing and other clinical deficits that have resulted in numerous patient catastrophes.

In the MUI review of the Dr Martin assault, Robert Winfrey SEH risk Manager is asked by Dan Byrne, DMH risk manager: "Were there sufficient staff on the unit given its acuity level? Mr. Winfrey admitted there was not. A follow up query from Byrne: "Given current census and staffing are we at risk for another incident? " Winfrey answers "yes." (MUI page 2)

10

Inadequate staffing could contribute to the event through inadequate supervision, or monitoring, and can also increase the harm in a given assault, as was the case here.

The staffing problem was an issue in the length and potentially the severity of the assault. More staff may have been able to reduce the severity and intensity of the assault Dr. Teter noted that "A code 13 was called because nursing staff could not stop this assault." (Teter page 2)

The impact of staffing is noted by the RN note the day of the event reads, "Nursing staff witnessed the assault from the beginning.... staff tried to stop but failed." (4/4/04 clinical note).

There were 3 women on the duty that evening shift, well below what the "Nurse Executive had obtained benchmarking information from local hospitals that indicated ratios of
1:4 patients 7am to 3PM; 1:5 patients 3PM to 11PM; and 1:7 patients 11PM to 7AM" (Fields p 16.) The night of the assault, the ratio was 3:27 or a 1 to 9 ratio, considerably below this standard. Only one staff individual was a nurse. Moreover, all staff were women which is also an area of concern--it is common practice to have a male on every high acuity unit in the field to help reduce risk of uncontrollable assault –which is one problem among many in this case—the staff was unable to stop the assault. Additionally concerning is that this was an admission unit which had received in the previous days many admissions--this was a very high intensity and busy service, overcrowded, well over census and understaffed.

The unit was over substantially census every day that Mr. Dunbar and Dr. Martin were there together, except for 4/2 when the census was down to 25.

Nurse Wusa Jibril reports in her deposition that the bed capacity for this unit was defined as "23 to 25" (deposition page 14). It is clear that the census is well over this limit throughout the week, over taxing an already inadequately staffed service.
Here is a breakdown of the consistent admission volume and the overall overcrowded census the week leading up to the assault:

3/29 1 admission census 33
3/30 3 admissions census 31
3/31 1 admission census 28
4/1 2 admissions census 27
4/2 1 admission census 25
4/3 2 admissions census 27
4/4 2 admissions census 29.
Department of Nursing Document (DC exhibit 178) Ward census RMB 4


The Admissions Unit of the Psychiatric Services ("the Admissions Unit") is for short-term, acute admissions and naturally requires additional resources and staffing as

11

compared to a unit servicing long-term or chronic psychiatric patients. There is no evidence that the low level of staffing in the Admissions Unit was in any way related an intentional decision, based on a thoughtful relationship between the Unit's clinical needs and its resources. Rather the data concerning the staffing of the Admissions Unit presents a Unit of chronic staff shortages, inadequate quality review and negligent oversight of the chronic staffing shortage.

At the time of Mr. Dunbar's and Dr Martin's stay at SEH, quality improvement, risk management and learning from the hospital's mistakes were almost nonexistent, and when done at all, were done by untrained people in a haphazard way. Robert Winfrey, SEH Risk Management Director prior to 2005, stated of his background, "I had not gone to an investigational school or classes. So I was, I guess in 2004, I was kind of learning, on the job training, and feeling my way around." (Winfrey deposition, page 5)

Patrice Ferris, who served as the Quality Improvement Data analyst for The District of Columbia at the time of the assault, noted the state of quality management in the District of Columbia, including at SEH at the time of the even in her December 20, 2007 deposition: "There were no investigations happening at the time..... I soon found out that nothing was happening and there was no follow up." (Ferris deposition, p 3).

Ms. Ferris later reflects on a discussion with her director regarding her perception of the need for a Quality Improvement program: "When are we going to implement a quality improvement program because we really need to do that.....and he (my director) just looked at me and said "That's a great question."....It was over two years ago (Ferris deposition, p. 6 ).

SEH did not have the vision, capacity or personnel to conduct thoughtful quality improvement preventive strategies in an environment known to be risky for patients. SEH was grossly and consistently understaffed and over their own stated census, which led to increased risk for the assault and increased impact of the assault as the inadequate staffing could not stop the attack once it began by all accounts.


## V. Grossly Inadequate Quality and Quantity of Staffing, Overcrowding, and Lack of Quality Processes Continue to Endanger SEH Patients Since the April 4, 2004 Incident

The culture of negligence continues at SEH.

Five outside groups ---the Department of Justice (DOJ), a consulting company, Fields and Associates, Consumer Action Network, University Legal Services and The Center for Medicaid and Medicare Services (CMS) reviewed the SEH system of care after the ... are very critical of the care at SEH and the absence of clear mechanisms in place to address staffing, quality, treatment, and risk issues.

12

## A. The Department of Justice Report on SEH

The 2006 DOJ investigation of SEH pursuant to the Civil Rights of Institutionalized Persons Act notes that "SEH staffing shortages are egregious and fall dangerously below the minimum levels required to provide basic levels of nursing services and care. SEH is understaffed by 68 RNs." (DOJ Report, p. 40)

The DOJ report cites the death or Dr Martin and several other catastrophic assaults and notes in the period following the assaults,

"In the four month period between January and April 2005, SEH documents reveal there were at least 138 patient to patient altercations. During a number of the patient to patient assaults there appears to have been little or no supervision. In several incidents, patients were subjected to life threatening harm. This is particularly troubling give the history of assaults at SEH, some of which have resulted in deaths, in the recent past."
(DOJ p 4)

The Department of Justice report also states, "In our judgment, SEH fails to provide its patients with a reasonably safe living environment. The facility too often subjects its patients to harm or risk of harm. SEH patients are subject to assaults and harm from elopements and suicides.... Resolution of these concerns is hampered by an inadequate risk management and quality assurance system, and inadequate investigations of abuse and neglect." (DOJ p. 3)

The DOJ Report further delineates the failures of a quality system at SEH and some of the resulting problems. "There is rarely any follow up or analysis (of incidents) (pg 11) SEH incident management system substantially departs from these generally accepted standards in several ways and exposes its patients to actual and potential harm (p 11) Psychiatric assessments are grossly inadequate....(pg 18) treatment plans at SEH incorporate goals and objectives that are not related to the actual needs of the patients, not achievable, and not measurable or specific. (pg 23) (Re Quality Assurance): With few exceptions, SEH has failed to identify these problems independently, or formulate and implement remedies to address them. Consequently actual and potential sources of harm to SEH patients are going unaddressed."

## B. The Fields and Associates Report On SEH

The Fields and Associates Consultative Report December 31, 2004 echo the DOJ's findings concerning staffing: "Staffing is at times dangerously low, especially on weekends, evening and night shifts. The additional concern that these staff are not receiving annual training compounds the safety issues." (Fields p. 14).

Significantly, the Fields Reports makes staffing quality and quantity the most important of its recommendations:
      (1)    Training and Competency of Staff:   Needs considerable improvement

13

  
(2)    Staffing:  Needs considerable improvement. Resulting inconsistencies of
staffing and related effects (e.g. missed trainings, incomplete orientation,
unnecessary restraint, etc) do represent a significant risk over time. As such this is
the highest priority concern identified in this systems review.

In a spot visit to the SEH Psychiatric Unit on December 13, 2004, Fields
consultants noted that "during an evening shift [11PM-7AM], 5 of 9 units were
found to have 1 or 2 less staff than required by the hospitals minimum staffing
guidelines for that shift.  Additionally, a number of the staff that were present had
been pulled from other units and received little or no trainings for their temporary
duties." (Fields p. 4).  Key vacancies noted included the Director of Quality
Improvement. The Report continues:  "SEH needs to develop immediate
strategies to reduce patient safety risks and a longer term staffing solution based
upon a more comprehensive and effective nurse staffing plan."  (Fields p. 5)

With regard to the Quality Improvement Program, both the DOJ and Field reports
found gaping holes in the quality improvement system.  Fields notes of the SEH
quality systems:

Needs Considerable Improvement......there is little evidence that such data is consistently
reported, analyzed and shared in a manner that supports its systematic deliberate use in
decision making and planning processes...Although SEH has a number of chronic
recurring concerns, there was no evidence shared that any of the concerns were (or had
recently been) addressed by a formal performance improvement project.  An example of
this can be found in risk management data on patient-on-patient assaults that are
repeatedly considered high but not further addressed by definitive performance
improvement action."  (Fields pp. 6-7)

Significantly, after the homicidal assault on Dr. Martin, and other instances of violence at
SEH, there continues to be no coherent quality improvement system to address patient-
on-patient violence at SEH.

## C. The Consumer Action Network (CAN) Report on SEH--a consumer supplement to the Fields report

The CAN report sheds light on one area of high relevance--the culture of the hospital as
seen from the consumer/patient and staff perspective. From this vantage point, the SEH
culture appears in almost every way to prevent good quality work. Learning from
incidents and developing thoughtful responses and then evaluating their effectiveness is
part of a system that improves quality.  That is not the culture described at SEH.  For
instance, the Consumer Action Network report described:

"Fear of retaliation is a prominent issue for both staff and consumers at the hospital.  For
staff this fear affects staff members willingness to report potential abuse, neglect or other
violations of consumer's rights, as suggested in interviews...In fact fear of retaliation
poses the potential for serious barriers in quality improvement and protection of

14

consumer rights."(CAN report, pg 36).

**D. University Legal Services, Patients in Peril report on SEH**

University Legal Services is the Protection and Advocacy organization for the District of Columbia and issued this report November 4, 2004. In it they review "overcrowded wards, inadequate clinical staff, insufficient medical resources, overworked and demoralized staff, deficient quality assurance/ improvement efforts.....these conditions have resulted in serious injury to patients and staff, as well as several recent patient deaths, which can be attributed to the hospitals inadequate medical resources, insufficient staffing, and a deficient quality assurance program..." They note 3 in-hospital deaths including that of Dr. Martin, and add that another patient gouged his eyes out while in the hospital and that a psychiatrist resigned after being assaulted. (ULS p 3) They conclude, "Patients' lives are in peril.." (ULS p13)

**E. Center for Medicaid and Medicare Survey of SEH July 14, 2004**

The report cites numerous deficiencies in the care and system of care at SEH. The initial corrective action plan submitted by SEH was rejected by CMS, as 8 of 13 of the corrective plans were unacceptable. CMS also noted that overcrowding and understaffing were severe and endemic to the facility--that 75% of the units were over census from April to June 2004. (ULS p5). In almost half of the cases reviewed, there were failures to provide individualized and comprehensive treatment plans based on the patients presenting problems and needs. Moreover for 11 of the 12 sampled treatment plans, the hospitals failure to develop measurable short and long term goals, resulted in a larger failure to provide a purposeful, goal directed treatment. (ULS p 10).

By all 5 of these independent accounts, Saint Elizabeth's Hospital's psychiatry service was and is a very dangerous place.

**Conclusion**

Mr. Dunbar has very belatedly been recognized as a highly dangerous individual by SEH. Two years to the day after the assault, SEH Forensic service clinicians write on April 4, 2006, "Without adequate supervision and psychotropic medication, Mr. Dunbar is likely to suffer repeated psychotic episodes resulting in lethal violence." (Bolton report, p.10).

Unfortunately for Dr Martin, the high risk posed by Mr. Dunbar was clearly evident in March of 2004 as well but was entirely missed due to numerous clinical and system omissions, negligence and failures.

I have had 22 years of experience in public sector psychiatry, including overseeing dozens of adult inpatient units though the licensing division of the Massachusetts Department of Mental Health. In my capacity as State Medical Director and Acting Commissioner for the Commonwealth of Massachusetts, I also have had occasion to

survey care quality at 6 state hospitals. I have worked in community mental health settings, homeless services, residential care and outreach services in child and adolescent

I have never on one occasion found a care system even remotely so impervious to serious and repeated feedback or clinical care so dangerously flawed and negligently applied as the one I have just reviewed at Saint Elizabeth's hospital in the preventable homicide of Dr. Alan Martin.

I hereby swear and affirm that foregoing is true and accurate.

Respectfully submitted,

Kenneth Duckworth MD
APBN Board Certified Psychiatrist in Adult, Child and Adolescent, and Forensic
Psychiatry

16